1          IN THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF TEXAS
              DALLAS DIVISION

3  UNITED STATES OF AMERICA,    )   **Case No. 3:21-cr-00435**
                                )
4          Plaintiff,           )
                                )   Dallas, Texas
5  V.                           )   October 1, 2021
                                )   9:30 a.m.
6  DAVID ANIMASHAUN (01),       )
   OLUWALOBAMISE MICHAEL MOSES  )
7    (2),                       )   DETENTION HEARING
   CHUKWUEMEKA ORJI (5),        )
8  EMANUEL STANLEY ORJI (6),    )
   FREDERICK ORJI (7),          )
9                               )
           Defendants.          )
10 _____)

11            TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE IRMA CARRILLO RAMIREZ,
12        UNITED STATES MAGISTRATE JUDGE.

13  APPEARANCES:

14  For the Plaintiff:        Mary Walters
                              UNITED STATES ATTORNEY'S OFFICE
15                            1100 Commerce Street, Suite 300
                              Dallas, TX  75242-1699
16                            (214) 659-8600

17  For Defendant Animashaun: Darlina C. Crowder
                              THE CROWDER LAW FIRM, P.C.
18                            7950 Legacy Drive, Suite 360
                              Plano, TX  75024
19                            (214) 544-0061

20  For Defendant Moses:      Christopher Shawn Coker
                              LAW OFFICE OF CHRISTOPHER S. COKER
21                            3131 McKinney Avenue, Suite 800
                              Dallas, TX  75204
22                            (214) 740-9955

23  For Defendant C. Orji:    Vickers Lee Cunningham
                              LAW OFFICE OF VICKERS L.
24                              CUNNINGHAM, SR.
                              6301 Gaston Avenue, Suite 410
25                            Dallas, TX  75214
                              (972) 445-5100

```
APPEARANCES, cont'd.:

For Defendant E. Orji:        Paul Taliaferro Lund
                              BURLESON PATE & GIBSON
                              Founders Square
                              900 Jackson Street, Suite 330
                              Dallas, TX  75202
                              (214) 871-4900

For Defendant F. Orji:        Mark L. Watson
                              MARK L. WATSON
                              5851 McCommas Blvd.
                              Dallas, TX  75206
                              (214) 912-8181

For U.S. Probation:           Officer Barnes

Recorded by:                  Angela Aguilar
                              UNITED STATES DISTRICT COURT
                              1100 Commerce Street, Room 1452
                              Dallas, TX  75242-1003
                              (214) 753-2167

Transcribed by:               Kathy Rehling
                              311 Paradise Cove
                              Shady Shores, TX  76208
                              (972) 786-3063
```

            Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.

1          DALLAS, TEXAS - OCTOBER 1, 2021 - 9:34 A.M.

2          THE COURT:  All right.  For purposes of our hearing

3     this morning, I'm going to take Ms. Vasquez's case first, as

4     soon as she gets here, because there's a waiver.  But I want

5     to go ahead and start covering some ground rules on these

6     other hearings that we're going to have.  I believe there are

7     Immigration detainers on two of the defendants and outstanding

8     warrants on a third.  Are we still going forward with hearings

9     on those cases, even though they cannot be released from

10    custody, they're going to be released into somebody else's

11    custody?

12          MR. FINN:  Thank you, Judge.  Can I approach?

13          THE COURT:  Why don't we stay right inside the well.

14          MR. FINN:  Okay.

15          THE COURT:  And speak up for me.

16          MR. FINN:  I'm sorry.  I got in trouble for not

17    wearing my mask earlier.

18          THE COURT:  Well, let's put it on.  I want to be sure

19    that the record reflects my statements on the -- the masks

20    muffle the sound, so that's why I've taken mine off.  I am, I

21    think, at a sufficient distance from everyone, behind

22    Plexiglas.

23          MR. FINN:  Sure.

24          THE COURT:  You're not behind Plexiglas, so --

25          MR. FINN:  Okay.

1          THE COURT:  All right.

2          MR. FINN:  My client is Mr. Alao.  Is he one with an

3    Immigration detainer?

4          THE COURT:  Yes.

5          MR. FINN:  In that case, we waive.  Because I know

6    you can't let him out.

7          THE COURT:  All right.  Have you spoken with him?

8          MR. FINN:  No.  And I actually need him to sign some

9    things.

10          THE COURT:  Okay.  Why don't we have you come over

11    and -- can we move him over to the corner so that he can -- or

12    someplace where he can visit with his attorney?

13      Mr. Orji, Mr. C. Orji, is the other one with a detainer, I

14    believe.  Yes.

15          MR. CUNNINGHAM:  We'd just like to go forward with

16    the hearing.

17          THE COURT:  Even though he can't be released?

18          MR. CUNNINGHAM:  I've got testimony that will

19    hopefully the change the Court's opinion.

20          THE COURT:  Even if I set a bond for him, he's going

21    to be taken into Immigration custody.  That's --

22          MR. CUNNINGHAM:  And I've got testimony for you to

23    hear.

24          THE COURT:  Okay.  And then Mr. Emanuel Orji has an

25    outstanding warrant from Collin County on a failure to appear.

1          MR. LUND:  Yes, Your Honor.  I've spoken with the

2     court coordinator from that jurisdiction.  My understanding

3     from -- rather, my office has spoken with her.  My

4     understanding is that a bond can be posted on that which will

5     withdraw the warrant.  The bond amount will be a little over a

6     thousand dollars.  He can make that bond.

7        If the Court is of the opinion that it's not appropriate

8     to go forward until that bond has been made, I'd ask the Court

9     to reset us for next Wednesday so that we can make the bond

10    and then come back for our detention hearing.

11         THE COURT:  He can -- it's up to you.  He's got a

12    failure to appear with an outstanding warrant.  It's up to you

13    if he -- if he wishes to waive, we can handle that today.  If

14    he wishes to go forward today, I'm ready to have his hearing.

15         MR. LUND:  Judge, he doesn't want to waive.  We do

16    want to go forward.

17         THE COURT:  Okay.

18         MR. LUND:  And we'd simply suggest that if the Court

19    is unwilling to let him out because of that particular issue,

20    the Court could always hold the order until the warrant is

21    made and then sign the order on Wednesday.

22         THE COURT:  He can go forward today or not.

23         MR. LUND:  Yes, Judge.  We'll go forward today.

24         THE COURT:  I will make my decision based on the

25    record.

1          MR. LUND:  Thank you, Judge.

2          THE COURT:  Thank you.

3      (Proceedings as to Defendant Vasquez, 9:37 to 9:39 a.m.)

4          THE COURT:  All right.  Let's see.  Let's get --

5   which defendant do we think we're going to have the most

6   testimony about?

7          MS. WALTERS:  Your Honor, from the Government, we are

8   going to present one agent, and we think it will be relatively

9   equal across all defendants who are going to testify -- I

10  mean, all defendants that we are seeking to detain.  I think

11  it will depend more on whether any defendants intend to put on

12  testimony.

13         THE COURT:  Okay.

14         MS. WALTERS:  So the question may be best directed to

15  them.

16         THE COURT:  Okay.  I am inclined to impose time

17  limits because of the number of defendants that we have.  I

18  understand that we'll have some overlap, but I'm considering

19  fifteen minutes per defendant.  Any reason why we need more

20  than that, to Defense Attorneys?

21         MR. COKER:  No, Your Honor.

22         MS. CROWDER:  No, Your Honor.

23         MR. CUNNINGHAM:  No, Your Honor.

24         MR. WATSON:  No, Your Honor.

25         MR. LUND:  No, Your Honor.

1          THE COURT:  All right.  All right.  And then for the

2     Government, because you've got to cover everybody, I'll give

3     you ten minutes per defendant total, so that should give you

4     enough to --

5          MS. WALTERS:  Yes, Your Honor.

6          THE COURT:  Plus an additional ten minutes for the

7     overview.

8          MS. WALTERS:  Thank you, Your Honor.

9          THE COURT:  Okay.  All right.

10     (Proceedings as to Defendant Alao, 9:41 a.m. to 9:44 a.m.)

11          THE COURT:  All right.  Let's move Mr. C. Orji over

12     to -- with counsel over to the table.  And then, Defense

13     Attorneys, you can come sit next to your client.  I think we

14     could probably put somebody back in the -- can we put another

15     -- Marshals, is it okay to put a defendant with --

16          MARSHAL:  Yes, Judge.

17          THE COURT:  -- his attorney in the corner on those

18     blue chairs?

19     (Pause.)

20          THE COURT:  All right.  Are we ready to proceed?

21     Ms. Walters, you may call your first witness.

22          MS. WALTERS:  Thank you very much, Your Honor.  The

23     Government calls Task Force Officer Jason Hollingshead.

24          THE COURT:  All right.

25          MR. LUND:  Your Honor, if I may very briefly.  I

1   apologize.  But having had a chance to speak to my client, if

2   we could possibly waive his hearing, with the right to come

3   back and ask for it when the Collin County hold is taken care

4   of, my client --

5           THE COURT:  Well, he can -- he can absolutely do that

6   if that's what he would like to do.

7           MR. LUND:  It is, Your Honor.  Just, and I apologize

8   to the courtroom.  But I was able to speak with him again.

9           THE COURT:  All right.  Let's --

10          MR. LUND:  Thank you.

11    (Pause.)

12          THE COURT:  All right.  If you'll show -- if you'll

13   stand, Mr. Orji.  Mr. Rogers is showing you a signed waiver.

14   Is that your signature?

15          DEFENDANT C. ORJI:  Yes.

16          THE COURT:  I mean, Mr. Lund.  I'm looking at Mr.

17   Rogers on something else.  Mr. Lund is showing you a signed

18   waiver.  Is that your signature?

19          DEFENDANT C. ORJI:  Yes, ma'am.

20          THE COURT:  Have you -- did you get a chance to read

21   the waiver before you signed it?

22          DEFENDANT C. ORJI:  Yes.

23          THE COURT:  Did you discuss it with Mr. Lund?

24          DEFENDANT C. ORJI:  Yes.

25          THE COURT:  And do you understand that by signing the

1  waiver, you're giving up your right to a detention hearing at

2  this time, but you've reserved your rights under the Bail

3  Reform Act to ask for a hearing if you are -- if you qualify

4  for a new hearing under the Bail Reform Act?

5       DEFENDANT C. ORJI:  (no audible response)

6       THE COURT:  Is that what you would like to do at this

7  time?

8       DEFENDANT C. ORJI:  (no audible response)

9       THE COURT:  I find that the waiver has been given

10  knowingly and voluntarily, and Mr. Orji is remanded to the

11  custody of the Marshal.

12     Mr. Lund, because he did not have retained counsel, I did

13  not arraign him last time, so do want him to do that now?

14       MR. LUND:  (faintly)  Yes, Judge.

15       THE COURT:  Mr. Orji, you told me that you did

16  understand the charges against you.  You still have the right

17  to have them read out loud at this time, but you may waive the

18  reading of the indictment.  What would you like to do?

19       DEFENDANT C. ORJI:  Waive it.

20       THE COURT:  How do you plead, guilty or not guilty?

21       DEFENDANT C. ORJI:  Not guilty.

22       THE COURT:  A not guilty plea is entered for you.

23  Your case is set in front of Judge Starr, who will be issuing

24  an order to set the trial date and pretrial deadlines.  Mr.

25  Lund's office is going to make sure that you are kept notified

1    of those deadlines.

2         Any questions about what we've covered?

3              DEFENDANT C. ORJI:  No, Judge.

4              THE COURT:  Anything else the Court should address,

5    Mr. Lund?

6              MR. LUND:  Not at this time, Your Honor.  Thank you.

7              THE COURT:  From the Government?

8              MS. WALTERS:  No, Your Honor.

9              THE COURT:  All right.  Good luck to you, sir.  You

10   may go with the Marshals, and counsel are excused if they have

11   no further matters before the Court.

12        All right.  Ms. Walters, now you may call your first

13   witness.

14             MS. WALTERS:  And Your Honor, as I do that, would you

15   like us to proceed as we did on Wednesday, questioning from

16   the table and remaining seated?

17             THE COURT:  Yes, please, to maintain social

18   distancing.  And especially because of the number of people.

19   We can limit movement.

20             MS. WALTERS:  Thank you, Your Honor.

21             THE COURT:  All right.  Agent, if you'll please come

22   forward and raise your right hand for me.

23        (The witness is sworn.)

24             THE COURT:  Please be seated, and please speak up

25   into that microphone for me.

1          JASON HOLLINGSHEAD, GOVERNMENT'S WITNESS, SWORN

2                         DIRECT EXAMINATION

3     BY MS. WALTERS:

4     Q    Sir, please state your name.

5     A    Good morning.  My name is Jason Hollingshead.

6     Q    And what is your position?

7     A    I'm a detective with the Denton Police Department and

8     currently assigned as a task force officer with FBI Dallas.

9     Q    How long have you been a police officer with the Denton

10    Police Department?

11    A    It will be fifteen years in December.

12    Q    What are your responsibilities as a task force officer

13    with the FBI?

14    A    So, I'm assigned to a squad that investigates, really,

15    just kind of the gamut of criminal offenses, anything from

16    violent crime to organized crime, to include fraud, bank

17    robbery, kidnapping, you name it.

18    Q    And have you had both training and experience in

19    investigating these crimes?

20    A    Yes, ma'am.

21    Q    Are you the case agent on the case captioned United States

22    versus David Animashaun, et al.?

23    A    No, I am not.

24    Q    Are you familiar with the case?

25    A    I am familiar.

1  Q    How did you become familiar with the case?

2  A    My initial role was really just kind of pitching in

3  wherever I could.  Primarily I was in a surveillance role,

4  following, watching.  I was also the team leader on an arrest

5  of one of the indicted codefendants.

6  Q    And have you also learned about the case by speaking with

7  case agents at FBI, IRS, and HSI?

8  A    Yes, ma'am.

9  Q    Okay.  Now, what kind of a case is United States versus

10 Animashaun, et al.?

11 A    I guess at its core it's a fraud case.

12 Q    Uh-huh.

13 A    Primarily dealing in romance scams.

14 Q    Does this fraud case -- well, and the investigation --

15 does it involve more kinds of scams than just romance scams?

16 A    Yes.

17 Q    What other kinds of scams have been encountered in the

18 course of the investigation?

19 A    Investigators also determined that there was UI fraud or

20 unemployment insurance fraud occurring, I know there was a lot

21 of identity theft occurring, and also a business email

22 compromise scam.

23 Q    Okay.  Now, for the Court's understanding, could you

24 briefly describe a romance scam, --

25 A    Certainly.

1   Q    -- what that -- what the typical aspects of a romance scam

2   are?

3   A    In a romance scam, you have an offender who will portray

4   himself or herself to be someone that they're not.  They'll

5   develop a fake dating profile, if you will, and they'll seek

6   out victims on various dating sites -- Match.com, Bumble, you

7   know, there's a thousand of those.  They usually target

8   susceptible victims, folks who are older or elderly or have

9   diminished mental capacity.  And they will, over time,

10  convince them that there's a romantic connection there.

11  They'll never actually meet in person.  It's usually

12  communications strictly online, sometimes over the phone.  At

13  some point, once they've garnered the trust of the victim,

14  they will make up some sort of lie about some tragedy or some

15  inconvenience that's occurred and they need money, and they

16  will convince the victim to send them money.

17  Q    And is the -- how long can these romance scams go on?

18  A    Years.

19  Q    And do these victims typically talk to the individual

20  until they're out of funds?

21  A    Yes.

22  Q    Okay.  Now, could you describe for the Court at a high

23  level what you understand unemployment insurance fraud to

24  entail?

25  A    So, during the COVID pandemic, there was a lot of relief

1    packages that were offered by state and federal government.

2    Unemployment insurance scams are run through states.  States

3    will pay out benefits to individuals who have become

4    unemployed -- due to the pandemic, in this case.

5            So, in unemployment insurance fraud, an offender will

6    actually steal the identity of a U.S. citizen.  These citizens

7    are typically elderly individuals who would not, you know,

8    otherwise would be applying for unemployment insurance.  But

9    the offender will steal that identity, will use that identity

10   to report their claim of unemployment, and will begin

11   receiving benefits from the state.

12   Q    Does unemployment insurance fraud also often involve

13   identity theft?

14   A    It does.

15   Q    Okay.  Is that because you have to have a real person's

16   identity to be able to submit the application for

17   unemployment?

18   A    That's correct.  You need -- you need all the personal

19   identifying information, to include Social Security number.

20   Q    So is there anything that distinguishes this particular

21   case, this fraud, from run-of-the-mill fraud cases?

22   A    I believe so.

23   Q    What is it?

24   A    For one, this investigation has revealed that this is a

25   very well-organized criminal enterprise.  It's long-term,

1   large-scale, international, and the primary purpose of this

2   criminal enterprise is to defraud and steal from American

3   citizens.

4   Q    Do you have a concern, based on your investigation and

5   your knowledge of the investigation, that, if released, these

6   defendants are a flight risk or present a danger to the

7   community?

8   A    Yes, I believe both are true.

9   Q    And at this point, have you heard any figures about the

10  dollars lost that have been identified in this investigation

11  or the number of victims affected so far in this

12  investigation?

13  A    I know by the last count I was told that the

14  investigation, which has spanned, I believe, four years, has

15  identified over one hundred victims and over $17 million in

16  losses.

17  Q    Now, let's turn to the first individual in this

18  conspiracy.  Let's start alphabetically with Mr. Animashaun.

19  And in fact, let's start first with his -- with concerns you

20  might have that he presents an economic danger to the

21  community.  Could you describe for the Court what your

22  concerns are based on?

23  A    Certainly.  The investigation has revealed that he is an

24  intimate player in this criminal enterprise that's defrauded

25  American citizens.  I can give you one example that

1    investigators learned about early on.

2         If you go all the way back to 2017 when he filed his

3    taxes, Mr. Animashaun reported to be a musician and a

4    producer.  On his 2017 taxes, he reported $13,000 in gross

5    income and then reported a $343 net profit in income.

6    However, by comparison, that very same year, he had multiple

7    bank accounts, just one of which that I can cite, in the year

8    2017 alone where he claimed a $343 income, had over $205,000

9    in transactions in that one account.  All of those funds were

10   victim funds.

11   Q    And when you say they're victim funds, is it because

12   they're wires into that account or cash deposits into that

13   account?

14   A    Yes.  All of the transactions in that one account were

15   from cash deposits and wire transfers.

16   Q    Okay.  Now, did -- with Mr. Animashaun, was he someone who

17   received funds directly, if I understand you correctly, from

18   victims?

19   A    Yes.  When I say he was a direct recipient, that means

20   that a victim in one of these scams wired money directly from

21   their account to one of his accounts.  So he was a direct

22   recipient of victim funds.  And he was also the recipient of

23   what I call co-conspirator funds, which are funds that were

24   sent to his account from the accounts of other indicted co-

25   conspirators.

1    Q    Now, you've mentioned what happened in 2017.  Is there

2    anything more current that indicates -- any more current

3    information that indicates he continues to be involved in

4    fraud or presents a danger to the community?

5    A    I believe so.

6    Q    And could you describe that for the Court?

7    A    So, as recently as two weeks ago, when investigators

8    executed a search warrant at Mr. Animashaun's home, they

9    located a notepad with multiple pages of personal identifying

10   information.  And this PII, as we call it, was fairly unique.

11   It appeared to potentially involve PII of foreign nationals --

12   Chinese citizens, to be more specific.  It contained their

13   FICO scores, for example.

14        Another interesting find during the search of his home was

15   he had an office and kind of a small library, and his library

16   was full of books on the power of persuasion and influencing

17   people and American idioms, which that in and of itself is not

18   illegal, but when you view that in the context of his

19   involvement in this scam it really speaks, I believe, to his

20   goal of practicing and improving upon his tradecraft, which is

21   scamming and stealing from American citizens.

22   Q    Is there additional -- any additional indications he

23   presents an economic danger, or it might be considered a

24   flight risk, through bank accounts?

25   A    Absolutely.  Investigators have determined that he has

1  access to multiple foreign bank accounts.

2  Q    Okay.  And these are in Nigeria?

3  A    Yes, ma'am.

4  Q    Okay.  Now, in addition to the access to foreign bank

5  accounts, do you believe that there are reasons he presents a

6  flight risk?

7  A    I do.

8  Q    And what would those reasons be?

9  A    For one, investigators were never able to locate Mr.

10  Animashaun's physical passport.  So there's always a concern

11  there.

12       Investigators have also seen routinely throughout the

13  course of this investigation that it's not terribly uncommon

14  for some of these defendants to possess or utilize falsified

15  or forged passports and IDs.  We know that Mr. Animashaun was

16  educated in Malaysia.  I mentioned previously the foreign bank

17  accounts.  We located a cell phone during the search of his

18  house.  That cell phone was just plugged in and charging.  And

19  it was all in Chinese characters, which, you know, we fear

20  could speak to additional foreign contacts.

21       And then Mr. Animashaun is also known to use aliases.

22  Q    Do you recall what aliases you've encountered?  Or agents

23  have encountered?

24  A    I know of two aliases.  One would be David Benson.

25  Q    Uh-huh.

1   A    And that name was located on several receipts from

2   businesses inside of his home during the search warrant.

3   Another alias is David Brown, which David Brown, that name was

4   found on documents inside his home, and coincidentally, the

5   vehicle that Mr. David Animashaun drives is registered in the

6   name David Brown.

7   Q    Is that vehicle the Toyota Avalon?

8   A    Yes, ma'am.

9   Q    And did he also have two other vehicles at the house when

10  the search warrant was run?

11  A    I don't recall that.

12  Q    Okay.  Now, so there's no current passport that has been

13  located?

14  A    That's correct.

15  Q    Okay.  Would that surprise you for someone who is from

16  Nigeria?  Is the concern, then, that there is a passport

17  somewhere but no one has been able to find it yet?

18  A    Yes, ma'am.  That's a fair statement.

19  Q    Okay.  Is there anything else that you would like to

20  highlight with respect to Mr. Animashaun before we turn to the

21  next defendant?

22  A    Other than the fact that I would point out that he was

23  found to be in possession, as recently as two weeks, at the

24  time of his arrest, of personal identifying information.  I

25  know that the snapshot that's in the indictment might be from

1  2017, but that does not mean that his criminal activity ceased

2  in 2017.  I believe that he is currently involved in criminal

3  activity, and I have every reason to believe that if he was

4  released today he would return right back to that same

5  criminal activity.

6  Q    And with -- let's turn to the next defendant.  Let's turn

7  to Mr. Moses.  Now, with Mr. Moses, let's focus on economic

8  threats that he has posed and continues to pose to the extent

9  he does.  Do you have any information that indicates he has

10 been an economic threat to the community?

11 A    Yes.

12 Q    And could you describe that for the Court?

13 A    During the course of the investigation, investigators

14 discovered that Mr. Moses had actually recruited, if you will,

15 he had scammed a female victim and had romanced her basically

16 directly via phone and convinced this woman to open up

17 accounts in her name and to receive victim money into her

18 accounts and then funnel it to him and to other co-

19 conspirators.  So I think it shows that not only is he

20 involved in the criminal activity directly, but he is willing

21 to scam directly.

22     In this case, we don't always know who's behind the

23 keyboard typing out the messages or sending the phony love

24 letters.  Because of the use of VPNs, you can remain

25 relatively anonymous on the Internet.  It's very tough to

Hollingshead - Direct                          21

1    track that.

2         So, in the absence of that, law enforcement does the next

3    best thing:  follow the money.  If we can't tell who's sitting

4    behind the keyboard, we can at least follow the money when it

5    leaves a victim's account and goes somewhere else.  And that's

6    what we've done in this case.  And Mr. Moses was a recipient

7    multiple times over of victim funds, and another individual

8    that he recruited, if you will, by fraud, convinced her to

9    open up accounts, she was a recipient of victim funds

10   unknowingly.

11   Q    And did he use aliases, to your knowledge?

12   A    Yes.  Investigators identified several aliases for Mr.

13   Moses.  I believe George Mike was one of them.  George

14   Williams, I think, might have been another one.

15   Q    Have you got any information that indicates he has a fake

16   passport in his name or a forged passport?

17   A    Yes.  Investigators did learn of the existence of a

18   potential forged Ghanaian passport with Mr. Moses' name and

19   photograph on it.

20   Q    And is there any indication that he had a foreign driver's

21   license?

22   A    Yes.  I believe he has a Malaysian driver's license.

23   Q    Do you have any information about where Mr. Moses is --

24   was born or is a citizen of?

25   A    I believe he's a -- was born in Nigeria.

1  Q    So, having a Ghanaian passport, a Malaysian driver's

2  license, and using aliases presents some concern to you?

3  A    Yes, ma'am.

4  Q    Okay.  Did he also have multiple accounts, multiple bank

5  accounts in his name?

6  A    He did.

7  Q    And if you -- did he also direct the victim to open bank

8  accounts as well, to facilitate the receipt of victim funds

9  and the movement of those funds?

10  A    That's correct.

11  Q    Okay.  Now, we've talked about some of the things that

12  have been found.  Do you have reason to believe that he has

13  access to funds abroad?

14  A    Yes.  We -- I do.

15  Q    Okay.  Why do you think that?

16  A    During the search of Mr. Moses' residence, we did find

17  printouts from what looked like an email that was sent from

18  Mr. Moses requesting a bank to send funds from his account to

19  Lagos Bank for the purpose of land.  That was in naira, which

20  is the currency, but the exchange, he was requesting $50,000

21  to be sent to a bank in Lagos.

22  Q    Was there also some sort of physical token that indicated

23  he had a live bank account?

24  A    I don't recall that.

25  Q    Okay.  Now, so he has access to funds abroad.  It appears

1  that he has access to property abroad.  Correct?

2  A    Correct.

3  Q    Okay.  Now, were any passports located during the search

4  warrant?

5  A    No.

6  Q    When you -- have you had a chance to look into Mr. Moses'

7  employment?

8  A    I have not looked into it directly.  I know that he told

9  investigators that he was self-employed, selling cars.  He

10 said that he sold cars through OCS Motors, which we know OCS

11 Motors to be a business owned by another indicted codefendant

12 who's sitting in this room.  But when questioned, Mr. Moses

13 told investigators that he'd been selling cars there for about

14 three years but he didn't know who the owner was, didn't know

15 the owner's name, and he was not charged any sort of fee for

16 selling cars on -- on this lot.

17 Q    And would it be correct to say that the Texas Workforce

18 Commission shows no employment since the second quarter of

19 2020?

20 A    Yes, that's correct.

21 Q    In addition to what you've already described found during

22 the search warrant, were there other indications of the

23 economic risk he presents?

24 A    Yes.  Just like, as I mentioned previously with Mr.

25 Animashaun, I believe that Mr. Moses poses a current economic

1    risk to the public.  His involvement in this scheme was

2    identified when the investigation began early on in 2017.  And

3    then, if you want to talk about present-day stuff, --

4    Q    Yes.

5    A    -- during the search of his house, investigators located

6    two pages, at least two pages of personal identifying

7    information.  These were separate sheets that had names,

8    Social Security numbers, all the identifying information you

9    could ask for.  And then, interestingly, at the top of the

10   sheet, he had -- or was written, "Call from" and then had

11   written out the number.  And they were different numbers.  So,

12   through experience, what we've seen in this investigation,

13   that leads me to believe that those are cheat sheets, if you

14   will, of -- victim cheat sheets.  These are victims of romance

15   scams, or potential victims, and -- that have previously been

16   communicated, and he has to designate which phone number to

17   call them from so as not to alert them to something suspicious

18   on their end.

19   Q    Were there also debit cards or bank cards located during

20   the search warrant?

21   A    Yes.  He actually had in his possession a Green Dot card

22   or a prepaid debit card.  The name George Williams was on that

23   card, which is not his name.  He also had four other cards

24   that were in his name, and then six additional Green Dot cards

25   with no name on them.

1   Q    Was there anything --

2            MS. WALTERS:  May I have just a moment, Your Honor?

3        (Pause.)

4   BY MS. WALTERS:

5   Q    Now, we've been -- you've been talking about what was

6   found during the search warrant, which is all current,

7   information that's current.  It doesn't relate back to 2017.

8   It's 2021.

9   A    Correct.

10  Q    Was there any indication that Mr. Animashaun -- sorry, Mr.

11  Moses would attempt to further disguise where he's calling

12  from via the use of cell phones or multiple SIM cards,

13  anything like that?

14  A    Yes.  So, actually, in the nightstand right by his bed,

15  there was a cell phone with no SIM card inserted.  However, he

16  had I want to say approximately fifteen like spare new SIM

17  cards laying there with the phone.

18  Q    Okay.  Is there anything else that we should cover with

19  respect to his risk of flight that we have not already

20  covered?

21  A    No, ma'am, I don't believe so.

22  Q    Okay.  Now, let's turn, then, to the next individual.

23  Let's see.  Let's turn to Emanuel Orji.  Oh, wait, Emanuel's

24  gone.  Sorry.  It is Frederick?  Yeah.  Frederick.  Sorry.

25  Sorry.  Let's turn next to Mr. Frederick Orji.

1      Now, with respect to Mr. Frederick Orji, do you believe

2   that he has presented -- has been involved in this conspiracy

3   that was charged in the indictment for quite a while?

4   A    Yes, ma'am.

5   Q    Do you believe that his involvement even predates the

6   conspiracy?

7   A    Yes, ma'am.

8   Q    And do you believe it continues to this day?

9   A    I do.

10  Q    Let's talk about the economic danger that Mr. Frederick

11  Orji presents.  What leads you to believe that he's been

12  involved in it even before the charged conspiracy and it

13  continues until after the charged conspiracy?

14  A    This investigation began in 2017.

15  Q    Uh-huh.

16  A    Investigators discovered Mr. Frederick Orji's involvement

17  in 2017, and were also able to track back to 2015 and see that

18  he was a recipient of victim funds as far back as 2015.  So we

19  have 2015, 2017, and then we have additional evidence that's,

20  you know, as recent as two weeks ago, at the time of his

21  arrest.

22  Q    Now, could you describe the evidence that came up or was

23  discovered at the time of his arrest?

24  A    Certainly.  So, Mr. Frederick Orji's brother, Emanuel

25  Orji, was also arrested.  A cell phone was seized from

1    Emanuel, and investigators have, pursuant to a search warrant,

2    gone through that device and have uncovered messages between

3    Emanuel and Frederick Orji.

4    Q    And what do those messages detail?

5    A    Reading through those messages, the appearance is that

6    Frederick and Emanuel Orji are involved together in a

7    structuring scheme, which just falls right in line with the

8    romance scam and -- fraud.

9    Q    Now, you know what, we should probably cover this.  In

10   romance scams, when the defendant receives the money, does it

11   stay in that account very long?

12   A    It doesn't.  So, this organization, this criminal

13   enterprise, is very well-versed in the art of money

14   laundering.  They're very, very good, and have for a long time

15   been very successful at avoiding the detection of law

16   enforcement.

17       One of the tactics that they use -- since they know that

18   we can't identify the person behind the keyboard, they know

19   that we're going to follow the money -- one of the tactics

20   that they employ is to move that money out of the account as

21   quickly as possible and move it in a variety of ways.  The

22   faster it moves, the more often it moves, the more difficult

23   it is for law enforcement to trace it.

24   Q    And is some -- are some of those movements done by simply

25   withdrawing cash?

1    A    Yes.

2    Q    And are some of those movements done, then, by buying

3    cashier's checks or money orders to --

4    A    Yes.

5    Q    Okay.  Now, you mentioned a structuring scheme that was --

6    that investigators believe was found on Emanuel Orji's phone.

7    Can you describe what those chats entailed?

8    A    Certainly.  Those are messages between Frederick and

9    Emanuel where they identify multiple places to stop on the

10   same day.  They talk about going to multiple post offices in

11   the same day or multiple stores at the same -- you know, on

12   the same day, to include GPS, you know, dropping location,

13   that sort of thing, kind of laying out the plan.  And when I

14   say that's indicative of structuring, that's because that's

15   something that I and other investigators have personally seen

16   multiple times throughout this investigation.

17   Q    So --

18   A    You -- I'm sorry.

19   Q    So they might be going to multiple post offices, multiple

20   grocery stores, to buy money orders or cashier's checks, but

21   if you weren't trying to structure or conceal your behavior

22   you could do -- you could buy all of them at the same place?

23   A    You could.  You could pull, for example, $30,000 out at

24   once.  However, with that amount of money, there's going to be

25   -- there's going to be some suspicion raised and that's going

1   to be reported to the Government.  That's common knowledge.

2   So one tactic that's used to defeat that is, instead of

3   pulling out $30,000, they'll pull out $3,000 from ten

4   different places, because the post office in Dallas and the

5   Tom Thumb in Mesquite don't talk to each other, so they're not

6   going to know that the same individual pulled out $30,000 in

7   one day.  They only see it as a $3,000 transaction, for

8   example.

9   Q    And so these two, the chats were in 2021 in which they're

10  discussing going to multiple places on the same day?

11  A    That's correct.

12  Q    Okay.  Now, in addition to that, was there an indication

13  during the search warrant that he has sources of funds that

14  are unusual for one individual?

15  A    Yes.  So, during the search of Frederick Orji's residence,

16  investigators located approximately 250 stored-value cards or

17  Green Dot cards in his possession.  And 250 is -- is a very --

18  is a very large number.  You know, you -- we see Green Dot

19  cards in fraud cases all the time.  Two hundred and fifty

20  possessed by one individual is quite a feat.

21  Q    And is that something that, in this investigation, has

22  occurred when investigators suspect unemployment insurance

23  fraud?

24  A    Yes.  That is a telltale sign of unemployment insurance

25  fraud.

Hollingshead - Direct                                    30

1    Q    Do you know why that is?

2    A    Yes.  Whenever an individual steals the identity of a

3    victim and obtains unemployment insurance fraud through a

4    state using that victim's identity, oftentimes the payout is

5    going to be auto-debited to a card or an account.  So, because

6    you're stealing an identity and you have to -- you have to

7    obtain this victim's identity to complete the fraud, preloaded

8    or stored-value cards are one of the most common ways to get

9    those funds sent from the state to the recipient or to the

10   defendant.

11   Q    So, having 250 is consistent with being a part of

12   unemployment insurance fraud?

13   A    Yes.

14   Q    A scheme?

15   A    Yes, ma'am.

16   Q    Now, was there other evidence indicative of engaging in

17   fraud found at Mr. Frederick Orji's house?

18   A    Yes, ma'am.  Investigators also recovered at Mr. Frederick

19   Orji's house 48,000 naira, which is concerning because it

20   shows access to foreign funds.  Investigators also located

21   $150,000 cash in U.S. currency in his residence.

22   Q    Okay.  And did he also have passports?

23   A    Yes.  One passport was seized.

24   Q    Now, has he -- have you looked at all his travel records?

25   A    Yes.

1   Q    Is he someone who travels frequently?

2   A    Yes.  I believe, since 2012, he has -- it's been reported

3   that he's taken fifteen international trips since 2012.

4   Q    And is he an individual who is easy to find, living in a

5   residence that's rented in his name, driving a car that's

6   registered to him, anything like that?

7   A    I don't recall if he's the actual leaseholder where he

8   lives or no.

9   Q    Okay.  Do you recall whether the car was registered to him

10  or another co-conspirator's business?

11  A    I do not.

12  Q    Okay.  Now, let's jump back to travel for just a moment.

13  Did I hear you correctly, fifteen trips?

14  A    Yes, ma'am.

15  Q    Okay.

16  A    Since 2012.

17  Q    Since 2012?  And do you recall his most recent known trip

18  to Nigeria?

19  A    I do not.

20  Q    Do you know whether he has family in Nigeria?

21  A    No, ma'am, I don't.

22  Q    Okay.  Does he have multiple bank accounts in the United

23  States?

24  A    Yes.

25  Q    Do you know whether he is employed currently?

1  A    According to the Texas Workforce Commission, I believe his

2  -- he does -- the Texas Workforce Commission does not show him

3  to have any employment --

4  Q    Okay.

5  A    -- right now, currently.

6  Q    Is there anything else we need to cover with respect to

7  Mr. Frederick Orji regarding risk of flight or economic

8  danger?

9  A    No, ma'am.  I think he falls in the same category as the

10  others that I've talked about, where there's a continuous

11  pattern of fraud and illegal activity, and I believe that, if

12  released, he would continue that pattern.  He's done it for

13  years.

14  Q    Now, let's talk about Mr. C. Orji.  With respect to Mr. C.

15  Orji, let's see, does he present an economic danger to the

16  community?

17  A    I believe so.

18  Q    And what is that based on?

19  A    Well, again, he was identified early on in the

20  investigation.  Investigators have shown that he was a direct

21  recipient of victim funds, going all the way back to 2017.

22       One interesting fact about Mr. C. Orji is that between

23  2014 and 2019 he was a signer on 24 different bank accounts,

24  which I believe is a very large number of bank accounts.  And

25  many of these accounts were open for very brief periods, one

1   month or two months, and those accounts were shut down by the

2   banks due to suspicious activity.

3   Q    And is he the owner of OCS Motors?

4   A    Yes.  I believe he owns OCS Motors and OCS Realty.

5   Q    Okay.  Now, is there any record at all in Texas Workforce

6   Commission for C. Orji?

7   A    No, ma'am, I don't believe so.

8   Q    And is there any record at all in Texas Workforce

9   Commission that indicates C. Orji employs anyone at OCS

10  Motors?

11  A    No, ma'am.

12  Q    Okay.  Now, let's talk about some of the inflow.  So, he's

13  got no Texas Workforce Commission records, no employees, 24

14  bank accounts.  Do you have any indication that he is involved

15  in fraud and that it extends -- it's more recent than the

16  conduct indicted in 2017?

17  A    Yes, ma'am.

18  Q    And could you describe that for the Court?

19  A    I can give several examples.  In 2019, Mr. C. Orji was

20  actually in contact with an FBI undercover, had conversations

21  with this FBI undercover, and Mr. C. Orji told that FBI

22  undercover directly that he was involved in cybercrime, fraud,

23  and cleaning money, money laundering.  That was in -- that was

24  a conversation in 2019.

25  Q    Okay.

A    There was a search conducted at OCS Motors just two weeks

ago, and Mr. C. Orji was found to be in possession of multiple

items that would lead me to be -- to believe that he's still

currently involved in fraud and is an economic danger.

Q    Could you describe those items?  I believe there were

several items found at OCS Motors.

A    Certainly.  So, investigators located multiple debit cards

in Mr. Orji's possession that were in other people's names.

He was actually in possession of a fake ID card, like a Texas

ID card.  That ID card had his photograph on it but had the

name -- I believe it was like Anthony Mike Opura (phonetic), I

believe, with different identifiers.  And coincidentally, he

also had a debit or credit card in his possession in the name

of Anthony Mike Opura.

Q    So, a fake ID and a debit or credit card in that same

name?

A    Yes.

Q    Now, were there also items found, such as was there a cash

counter found?

A    I believe there was a cash counter at the -- at the

business.

Q    Is there anything else at the business that you would want

to highlight?

A    Investigators -- one very savvy investigator actually

located a bag that was concealed inside a printer.  It was a

1   standup printer.  You remove the drawer and had to reach in

2   and up, and there was a bag, and that bag was full of -- there

3   was a -- there was a passport belonging to a female in there.

4   There was a credit card skimmer.  There was a chip reader.

5   And there was a plethora of prepaid cards and blank IDs.

6   Q    Prepaid cards and blank IDs?  Okay.  And that was hidden

7   inside a printer at OCS Motors?

8   A    Yes, ma'am.

9   Q    Okay.  Now, a search warrant was also run at his home.

10  Correct?

11  A    Yes, ma'am.

12  Q    Was anything of note taken from the home?

13  A    Yes.  Investigators actually recovered two firearms from

14  the home.

15  Q    And is Mr. C. Orji someone who has legal status in this

16  country to possess the firearms?

17  A    No.

18  Q    Okay.  And is it your understanding that ICE has placed a

19  detainer on Mr. C. Orji?

20  A    That's my understanding.

21  Q    And that he has no current work authorization permit?

22  A    That's correct.

23  Q    Okay.  Oh, you know what, let's go back, just to make sure

24  that there's no gap in understanding for the Court.  You

25  mentioned a credit card skimmer.  Could you tell the Court

1    what a credit card skimmer is?

2    A    It's a machine that you can run a card through and record

3    all the numbers and identifying information, excuse me, off

4    that card.

5    Q    Is it the kind of device that would be placed on like a

6    gas tank, when you're filling up your gas tank and you run

7    your credit card through, it would be placed there to capture

8    the customers' bank card information?

9    A    Yes, ma'am.  I've seen them on gas pumps.  I've seen them

10   at self-checkout terminals in Walmarts, for example.  Anywhere

11   that a credit card is swiped, you can -- you can put one in.

12   Q    And you also mentioned a chip reader.  Is there -- was

13   there a chip writer?

14   A    I'm sorry, that's -- that's what it -- it's a chip writer.

15   It's meant to, I guess, I think -- it looked like it was to

16   make perhaps some sort of access cards.

17   Q    Okay.  And the last question with respect to -- with

18   respect -- since we're covering technology, and I didn't want

19   there to be a lack of understanding, previously when you spoke

20   about Mr. Moses you spoke about SIM cards being located next

21   to a cell phone that didn't have SIM card.  Could you describe

22   why it would be notable that multiple unused SIM cards is

23   unusual and why it gives you pause?

24   A    Well, it's unusual because there's -- I struggle to think

25   of a reasonable and legal explanation as to why you would

1   need, say, fifteen SIM cards for your cell phone.

2        I believe that it's so that way you can use the same

3   device but swap out the SIM cards and you basically have a new

4   phone that you can call different victims from.  So that way

5   you're not calling all of your victims from one single number.

6   You, in essence, have fifteen different numbers that you can

7   call from.

8   Q    Okay.  Is there anything else that I have neglected to

9   cover with respect to economic danger for Mr. C. Orji?

10  A    No, ma'am.  I believe that, just like the other defendants

11  that we've spoken about in this case, he has been involved in

12  this criminal scheme for years and is currently involved in

13  criminal activity.  By his own admission, he said that he was

14  involved in fraud, cybercrime, and laundering money.  And I

15  have every reason to believe that if he was released today

16  he's not going to change his ways, he's going to continue

17  doing what he's done for years.

18  Q    Okay.

19            MS. WALTERS:  May I have just a moment, Your Honor,

20  before I --

21       (Pause.)

22            MS. WALTERS:  I pass the witness.

23            THE COURT:  Mr. Cunningham?  And I'm going to ask you

24  to move the microphone close to you.

25            MS. WALTERS:  Your Honor, I -- before I pass, I made

1  a mistake.  I need to ask the agent if he recognizes the

2  defendants in the courtroom.

3          THE COURT:  All right.

4                  DIRECT EXAMINATION, RESUMED

5  BY MS. WALTERS:

6  Q    Sir, could you identify the defendants?

7  A    I believe we have Mr. Animashaun over here to my far left,

8  Mr. Moses sitting there a little further to my right and Mr.

9  Animashaun's left.  Mr. C. Orji is seated at the table, and

10 Mr. F. Orji is seated in the back or the corner.

11         MS. WALTERS:  Let the record reflect the witness has

12 identified the defendants.

13         THE COURT:  The record will so reflect.

14         MS. WALTERS:  I pass.

15         THE COURT:  All right.

16                      CROSS-EXAMINATION

17 BY MR. CUNNINGHAM:

18 Q    Sir, did I get your name correct?  Is it Hollingshead?

19 A    Yes, sir.

20 Q    Hollingshead.  Agent or Officer?  Or Detective?

21 A    You can call me Detective.  That works.

22 Q    Detective Hollingshead, you gave us a full review of four

23 of these individuals, two of which are Mr. C. Orji, and his

24 nickname is Eme (phonetic).  I can't pronounce his given name

25 very well.

1      The two brothers, Frederick and Emanuel, you detail for

2    the Court there's a lot of communication between those two

3    brothers as far as the structure and moving money around,

4    correct?

5    A    Yes, sir.

6    Q    However, you didn't detail any communication between C.

7    Orji and his other two brothers.  Do you have any

8    communication showing he was aware of what they were doing?

9    A    I don't at this time.  I'm not the one who's going through

10   devices.  And that investigation is ongoing.  So those devices

11   are still being actively processed.

12   Q    When OCS Motors was searched pursuant to a warrant,

13   approximately how many vehicles were seized?

14   A    I don't know, sir.  I was not -- I wasn't present at that

15   one.

16   Q    Would the number eighty vehicles be reasonable?

17   A    I honestly have no idea, sir.

18   Q    What type of business was OCS Motors?

19   A    I believe it was a car dealership.

20   Q    A you-tow-'em lot -- lot, wasn't it?

21   A    I'm sorry.  Say again, sir?

22   Q    We call them you-tow-'em.  He was selling cars and taking

23   weekly payments for cars?

24   A    I'm not sure, sir.  I don't know the details of his

25   business.

1  Q   If he were in the business of selling used cars and taking

2  weekly payments from people who purchased these cars, would it

3  be unusual for him to have cash?

4  A   No, sir.

5  Q   Would it be unusual for him to have a cash machine, a

6  counting machine?

7  A   No, sir.  Not at all.

8  Q   Would it be unusual for him to have a credit card machine

9  to process credit cards?

10  A   That's possible.  Yes, sir.

11  Q   Those things are indicative of a legitimate, legal

12  business?

13  A   Except for the fact that they were concealed inside a

14  printer.  But yes, sir, otherwise.

15  Q   But he had other items that were out in -- in the

16  business, correct?

17  A   What do you mean, sir?

18  Q   Not everything was inside this printer?

19  A   No, sir.  The credit card skimmer was.

20  Q   Okay.  Now, you indicated that he did not have a work

21  authorization card.

22        MR. CUNNINGHAM:  May I approach the -- she's got the

23  original.  His wife's got the original.

24      (Counsel confer.)

25  BY MR. CUNNINGHAM:

1  Q    Detective Hollingshead, I'm showing you what --

2            THE COURT:  No.

3  BY MR. CUNNINGHAM:

4  Q    I'm going to show you exactly -- can you tell the Court

5  what that is?

6  A    It appears to be a photocopy of an ID, U.S. -- United

7  States of America employment authorization, Chukwuemeka Orji.

8  Q    And it's valid from 11/19 of '20 to November the 18th of

9  '21?

10  A    That's what it states.  Yes, sir.

11  Q    And I gave the original card to USA.  And here's his

12  passport.  Did you find his passport at his home?

13  A    I was not at his home.  Investigators, I believe, did.

14  (Pause.)  I'm sorry, there was no passports located during the

15  search of his residence or business.

16  Q    So if, in fact, he did possess a valid current U.S. work

17  authorization card, your information would be incorrect?

18  A    That's accurate.  Yes, sir.

19  Q    And you detailed that his brother had been to Nigeria or

20  fifteen international trips.  Has Mr. C. Orji left this

21  country in the last ten years?

22  A    Not that I'm aware of, sir.

23  Q    And how long do you show that Mr. C. Orji lived in the

24  home in DeSoto?

25  A    I'm not sure, sir.

1  Q    You made references to his brothers, that you didn't know

2  where they lived and they were moving around a lot.  He's

3  lived in his home for more than ten years and they own that

4  home, correct?

5  A    That's my understanding.  Yes, sir.

6  Q    So his situation is very different than his two brothers.

7  Would you agree?

8  A    When it comes to their living arrangements, yes.

9  Q    And he had a legitimate legal car business with -- that he

10  was generating income from the car business, correct?

11  A    Well, the investigation is still ongoing, so I can't speak

12  to the legitimacy of his business, but he did have that

13  business, OCS Motors.

14          MR. CUNNINGHAM:  Pass the witness.

15          THE COURT:  Okay.  Go ahead.

16          MR. COKER:  Just, I haven't seen the search warrant

17  or anything.

18          THE COURT:  Before, before you start, can I ask you

19  to please move the microphone over to the corner and for you

20  to --

21          MR. COKER:  I'm sorry.

22          THE COURT:  -- speak up.  Thank you.  There is no

23  court reporter, but the proceedings are being recorded, so

24  it's important to be able to hear you.

25                        CROSS-EXAMINATION

1  BY MR. COKER:

2  Q   All right.  Just for a little clarity, you were

3  investigating these romance schemes from 2017, correct?

4  A   I was not personally.  The FBI, IRS, HSI --

5  Q   Okay.

6  A   -- law enforcement organizations were.

7  Q   All right.  And when -- so you got a search warrant to

8  search -- an arrest warrant or search warrant for Mr. Moses'

9  home, correct?

10  A   That's correct.

11  Q   Off of information that was from 2017?

12  A   I did not write the search warrant, so I don't know

13  exactly what those affidavits entailed.

14  Q   Okay.  And after you -- I guess after you, you know, did

15  the search warrant, you did the search, did you find anything

16  that applied to the 2017 case?

17  A   I have not gone through everything --

18  Q   Okay.

19  A   -- that was seized from his house, and the investigation

20  is ongoing, so I can't speak to that.

21  Q   Okay.  And so the next question I'm asking you is you

22  talked about SIM cards you found and you said that that, you

23  know, makes it -- might have some basis for fraud.  Correct?

24  A   That's correct.

25  Q   Okay.  Could it be that he buys prepaid SIM cards to call

1    his brother and sister in Nigeria and his other brother in the

2    U.K. and it's cheaper for him to buy the SIM cards and use

3    those as prepaid instead of his service because he doesn't

4    have international service?  Could that be a reason that he'd

5    have all those SIM cards and not for fraud?

6    A    Sure.  Yes, sir.

7    Q    Okay.  And would that make, I guess, your -- his

8    likelihood of committing more crimes or, you know, being a

9    flight risk less or more?

10   A    I'm sorry.  You faded away.  I couldn't understand the

11   last part.

12   Q    Okay.  So, basically, if you -- if that was the case, that

13   these were prepaid cards, it wouldn't show any indication of

14   fraud or any kind of flight risk, right?

15   A    Just the SIM cards?

16   Q    Yes.  If they were inter -- if they're used just for

17   international calls.

18   A    If we're talking only about SIM cards, --

19   Q    Okay.

20   A    -- that's fine.  That doesn't account for the pages of

21   personal identifying information he possessed.

22   Q    Okay.  But that personal identifying information, that's

23   gone, right?  You took that?  So he doesn't have that anymore,

24   right?

25   A    Correct.

1    Q    Okay.  And then you said there wasn't a passport at the

2    house.  If he had his passport in a bank security box, would

3    that make sense, instead of at his home?

4    A    He certainly could.

5    Q    Okay.  And --

6    A    Are you talking -- I'm sorry.

7    Q    I'm talking about Mr. Moses.

8    A    Okay.

9    Q    You said that during the search you didn't find a

10   passport, and that was --

11   A    Correct.  We didn't find --

12   Q    -- some sort of strange thing.

13   A    -- his actual passport or the fake Ghanaian passport.

14   Q    Okay.  And where did this fake Ghanaian passport -- how do

15   you know about that?

16   A    It was sent via email.

17   Q    A passport was sent via an email?

18   A    Yes.  I can tell you the story, if you'd like.

19   Q    Okay.

20        (Pause.)

21   Q    All right.  Now, you talked about other people with chats

22   for money orders, but that doesn't have anything to do with

23   Mr. Moses, correct?

24   A    You -- I'm sorry, sir.  I didn't --

25   Q    You talked about other defendants having chats regarding

1   money orders and going to pick up stuff from Western Union so

2   that it doesn't go over thirty -- you know, didn't go over

3   $3,000.  But that didn't involve him, right?

4   A    The chats between Emanuel and Frederick Orji did not

5   involve Mr. Moses.

6   Q    Okay.

7   A    That's correct.

8   Q    And you talked about the Green Dot cards.  I guess on one

9   defendant you found 25.  And on him you found like eight or

10  so?

11  A    Yes, sir.  I believe there was at least six, and then

12  there was one that was in a different name.  So I think seven

13  total.

14  Q    And so those were -- the six that you found were in his

15  name?

16  A    No, sir.

17  Q    Okay.  They just didn't have a name?

18  A    They were like Valued Customer or --

19  Q    Okay.

20  A    -- My Gift Card type things.

21  Q    All right.  And you talked about a Malaysian driver's

22  license.  Did you know that he went to school in Malaysia and

23  that he lived in Malaysia for a while?

24  A    Yes, sir.  I knew that he was educated in Malaysia.

25  Q    Okay.  So the Malaysian driver's license wouldn't be

1   anything suspicious or make you think that he's a flight risk

2   or a danger, correct?

3   A   I would disagree when it comes to flight risk.  I think it

4   shows that he's very comfortable traveling outside of the

5   United States and living outside of the United States.  So I

6   think it could speak to that.

7   Q   Yes.  I mean, he lived in Malaysia, but then he's been

8   here for six years.  And he hasn't been back --

9       (Counsel confers with Defendant.)

10  BY MR. COKER:

11  Q   He's never been back to Malaysia.

12  A   Yeah.  I was -- I was not aware.

13  Q   Okay.  And are you aware -- you talked about other

14  people's international travel.  Are you aware of any

15  international travel involving Mr. Moses?

16  A   I know of one since 2016, where he flew to Qatar.

17      (Counsel confers with Defendant.)

18  BY MR. COKER:

19  Q   Okay.  Would you -- I guess if you knew that he had gotten

20  married about five years ago and he took his wife to meet his

21  family in Nigeria and that's the only international travel

22  he's had, would that make sense -- would that make sense to

23  you?

24  A   That's very possible.  Yes, sir.

25  Q   Okay.  And would you say that that's somebody who looks

1  like they're a flight risk, if they just go to Nigeria to --

2  and introduce their new wife to their family?  That's a

3  legitimate trip, correct?

4  A    Yes, sir.

5  Q    Okay.  And he had no other international travel during the

6  past six years?

7  A    The only one that I'm aware of is October of 2017.

8  Q    Okay.  And as far as you talked about his business, he

9  sells cars.  He also works part time.  He does Uber driving,

10  he does Door Dash.  And he's filed taxes on those.  Correct?

11  A    That's my understanding.  Yes, sir.

12  Q    Okay.  And are you aware -- were you there when he was

13  arrested?  Did you execute that warrant?

14  A    No, sir.

15  Q    Okay.  Were you aware he has a -- he had a son living with

16  him?

17  A    Yes.  I did hear that.

18  Q    Okay.  And his son has special needs?  He's autistic?  He

19  takes care of him?

20  A    I was not aware of that.

21  Q    Okay.

22            MR. COKER:  No more questions.  Pass the witness.

23            THE COURT:  How about for Mr. Frederick Orji?

24                      CROSS-EXAMINATION

25  BY MR. WATSON:

1  Q    Detective, in the return, did you notice where it says

2  two -- oh, I'm Mark Watson and I represent Freddy.  Detective,

3  did you notice that the return said two passports on the

4  return from his apartment or house?

5  A    No, sir.

6  Q    Okay.  Would it -- I've got a picture of it on my phone.

7  Would you like to see it?

8  A    I -- no, sir.  I have no reason to doubt that.

9  Q    Okay.  So it says two passports.  And I think that you --

10 you're aware that he has a U.S. passport, correct?

11 A    I'm not sure where his passport is out of.  I do see in my

12 notes that at least one passport was seized.  But I'm not --

13 I'm not sure what the originating country is on that.

14 Q    Okay.  Do you -- would it -- do you want me to show you

15 the return that says two passports were taken?

16 A    No, sir.  I have no reason to doubt that.

17 Q    Okay.  All right.  I'm informed that he is a naturalized

18 citizen out of New York state for approximately five years.

19 And later today, could you confirm that, or could you or your

20 FBI partners confirm that later in the day with the U.S.

21 Naturalization Service?

22 A    We can certainly try to find that out.

23 Q    Okay.  You think you can do that today?

24        MS. WALTERS:  I'm going to object.  I think we've had

25 this information and we've previously provided it.  He --

1   we're not going to show that he's a U.S. citizen.  He's a

2   legal permanent resident.  ICE -- we checked twice.  There is

3   no record that ICE has of his citizenship.

4          THE COURT:  Of Mr. Frederick Orji's citizenship?

5          MS. WALTERS:  That's correct.

6          THE COURT:  Okay.

7   BY MR. WATSON:

8   Q   Detective, you say that you believe that, for lack of a

9   better term, a tiger doesn't change its stripes.  Is that your

10  theory?

11  A   Yes, sir.

12  Q   You think -- so you think that if he is let out, he will

13  -- he will, if he is involved in fraud, you think he'll pick

14  it up tomorrow?

15  A   I think that's a very real possibility.

16  Q   Possibility, but it's just -- it's just speculation on

17  your part, correct?

18  A   Certainly.  I can't -- I can't predict the future.

19  Q   Okay.

20  A   I just, I think, generally speaking, --

21  Q   Okay.

22  A   -- I believe he's a danger economically to --

23  Q   Okay.

24  A   -- the country.

25  Q   And you're aware that there is a huge business in the U.S.

1    about buying and selling gift cards or little -- or little

2    currency cards with money on them?  It's enormous.

3    A    Okay.  I'm not aware of it.

4    Q    You're -- you're not aware of people that are in the

5    business of buying and selling, if it has $100 on there, they

6    give them $80 or a discounted value?

7    A    Okay.

8    Q    Are you aware of people that do that for a living?

9    A    Well, I don't know anyone that does it for a living, but I

10   -- I have seen things for sale on social media sites or

11   whatever.

12   Q    All right.  So, --

13   A    I didn't realize that you could make a business.

14   Q    So, it's a common occurrence in the United States of

15   America that people do that; is that correct?

16   A    I have no reason to doubt that.  That's very possible.

17   Q    Well, you're a -- you've testified that you do a lot of

18   fraud investigation and that you're a general fraud detective

19   tied -- that you do a lot of investigation and you're a

20   general detective, criminal law.  Correct?

21   A    I'm sorry.  Could you rephrase the question?  I didn't

22   understand it.

23   Q    Well, it's just surprising that you don't know about that

24   when you say that you're a -- when you present to the Court

25   your bona fides about your criminal investigation background.

1  A    You had asked if I was aware that there was a lot of

2  businesses.  I said I was not aware.  I -- my intention was to

3  explain that I was not aware that there was a lot of

4  businesses whose, you know, business plan was selling gift

5  cards.

6  Q    Let me rephrase that.  Are you aware that there are lots

7  of people in the United States that do that?

8  A    Yes, there are people who sell gift cards.  I don't know

9  how many.  I don't know how common it is.  But I do know that

10 that exists.

11 Q    And they buy and sell them, correct?

12 A    Yes, sir.

13 Q    Thank you.  The text messages between Emanuel and

14 Frederick, are those one-way or two-way messages?

15 A    They're two-way, sir.

16 Q    And do you have any evidence that Frederick picked up

17 money at different locations?

18 A    I haven't examined them in enough detail to determine how

19 much or if or when.  I just know that those were the plans

20 that were laid out in the text messages.

21 Q    And so those were discussions, but you don't know if they

22 were acted upon.  Correct?

23 A    That's correct.

24 Q    If -- if the Government seized a Nigerian passport and a

25 U.S. passport from Frederick, would that make it more

1   difficult for him to leave the country?

2   A    Well, it -- it's hard to say.  We have seen multiple times

3   throughout this case with other defendants the use of forged

4   government documents.  Forged IDs and --

5   Q    But you don't have any --

6   A    -- forged passports.

7   Q    -- evidence of Frederick --

8           MS. WALTERS:  If he can let the witness finish his

9   answer.

10          THE COURT:  Hold on.  Hold on.  Everybody take a

11   minute.  All right.  One at a time.  Let's see.  Were you

12   finished with your answer?

13          THE WITNESS:  I believe so.  Yes, ma'am.

14          THE COURT:  All right.

15   BY MR. WATSON:

16   Q    You don't have any evidence of Frederick having access or

17   stories about falsified passports, do you?

18   A    No, sir.  That's correct.

19   Q    And you can't get on an airplane at D-FW without a

20   passport; is that correct?

21   A    Not for an international flight.  No, sir.

22   Q    And it's not illegal to have $150,000 in cash, is it?

23   A    Suspicious, but not illegal.

24   Q    Suspicious?  Okay.  Does he have any violent history?

25   A    Not that I'm aware of, sir.

1    Q    Did you find any arrests?

2    A    None that I'm aware of, sir.

3    Q    And could it be that he has -- you said twelve -- could it

4    be twelve trips, or fifteen trips?

5    A    Fifteen international trips since 2012.

6         (Pause.)

7    Q    If a person is self-employed, would it necessarily show

8    Texas Workforce Commission?

9    A    No, sir.  Not always.

10   Q    So the fact that he doesn't show employment doesn't mean

11   that he's not otherwise making money perhaps legally?

12   A    Perhaps.  Yes, sir.

13   Q    Okay.  So that's not a -- I mean, most of the lawyers in

14   here probably don't have a TWC file, I guess, right?

15   A    Right.

16   Q    Okay.

17         MR. WATSON:  Judge, could I have one more second?

18        (Pause.)

19   BY MR. WATSON:

20   Q    Detective, if we -- if in the next day or two I was able

21   to show to the Court that Freddy has a U.S. passport and is a

22   naturalized citizen, would that affect your view of whether or

23   not he may or may not be a flight risk?

24   A    No, sir, it would not.

25   Q    Would you think that it is more likely than not that he,

1   if he is a U.S. citizen, would that -- think it more likely

2   than not that he's not a flight risk?  Or would it -- would

3   that increase, to me or to the Court, would that indicate to

4   you that he is less likely to be a flight risk if he is a --

5   if he's a U.S. citizen?

6   A    No, sir.  Not necessarily.

7   Q    Did you find any firearms?

8   A    No, sir.

9            MS. WALTERS:  Pass the witness.

10           THE COURT:  All right.  For Mr. Animashaun.  And

11  gentlemen, I'm going to ask one of you to please move back so

12  that Ms. Crowder can have the microphone.

13           A VOICE:  Is this good?

14           MS. CROWDER:  Yes, this is good.  Thank you.

15                         CROSS-EXAMINATION

16  BY MS. CROWDER:

17  Q    Hello.  How are you?

18  A    Good morning.  I'm well.

19  Q    I just want to ask some specific question with regards to

20  Mr. Animashaun.

21  A    Yes, ma'am.

22  Q    First, you had mentioned -- well, have you had the -- I'm

23  sure you've had the opportunity to read the indictment; is

24  that correct?

25  A    Yes.

1    Q    Okay.  And in the indictment, it has 28 different --

2    that's listed just in the indictment for specific -- 28

3    different manner and means as to how all the -- each specific

4    defendant committed fraud.  Is that correct?

5    A    I believe that's correct.

6    Q    And with regards to Mr. David Animashaun, you'll agree

7    that there are only -- that his name is only listed five times

8    out of the 28?  Would you agree?

9    A    I -- if you're looking at it, then I trust you.  I don't

10   -- I don't have it sitting in front of me and I don't recall

11   exactly how many times his name is mentioned.

12   Q    Okay.  And you'll agree with me that there are two counts

13   in this conspiracy; there's the money laundering and then

14   there's conspiracy to commit fraud.  Is that correct?

15   A    That's correct.

16   Q    And you'll agree with me that David Animashaun is not

17   indicted on the money laundering count, correct?

18   A    I believe that's correct.

19   Q    Okay.  You also mentioned that when you did the search

20   warrant that you found it suspicious that in his library he

21   had books titled *The Power of Persuasion*, things of that

22   nature, right?

23   A    Correct.

24   Q    Now, you'd agree with me those books are actually targeted

25   for entrepreneurs?

1    A    Certainly, entrepreneurs and sales -- people in sales, a

2    lot of times.

3    Q    Okay.  I actually have that book.  You're not saying that

4    I have a tendency to commit fraud; is that correct?

5    A    That's correct.

6    Q    Okay.  Okay.  And that, it's actually a really good book.

7    But I just wanted to clear that up.

8         Now, with regards to you said that he had access to

9    multiple bank accounts, but that's all you said about it.  So

10   what evidence do you have that he has access to multiple bank

11   accounts?

12   A    Are you talking currently?  Or --

13   Q    Well, all you said --

14   A    -- just in general?

15   Q    -- was that he had access to multiple bank accounts.

16   A    Right.  I was -- I was trying to paint a picture of a kind

17   of his involvement, the fraud scheme of his.  And I had

18   mentioned that investigators have, over the course of the

19   investigation, identified multiple accounts, and then I cited

20   the one specific with the $205,000 that was all attributed to

21   victim -- victim money.

22   Q    Okay.  With regards to his passport, you said that when

23   you did the search warrant you did not find a passport; is

24   that correct?

25   A    I believe that's correct.

1  Q    Okay.  And have you been able to check and confirm that

2  his passport actually expired in 2018?

3  A    I have not checked.  No, ma'am.

4  Q    With regards to any type of fraud with regards to your

5  search warrant, did you find any credit cards with other

6  people's names on it in his -- in the search of his home?

7  A    Well, I was not present at the search of his home, but

8  none that I'm aware of.

9  Q    Okay.  During the search warrant, are you aware, did you

10 find -- did they find any driver's licenses with other

11 people's names on them?

12 A    Not that I'm aware of.

13 Q    Did you find any driver's licenses with David Animashaun's

14 picture and other people's names on them?

15 A    Not that I'm aware of.

16 Q    Did you find -- did they find any SIM cards in the search

17 of his home?

18 A    None that I'm aware of.

19 Q    Okay.  Do you -- did they find any firearms?

20 A    No, ma'am.

21 Q    Do you have any information of him having any kind of

22 violent criminal history?

23 A    No, ma'am, I don't.

24 Q    Okay.  With regards to his trips outside the country, do

25 you have any documentation or any information with regards to

1    any trips outside the country?

2    A    No, ma'am, I don't know that.

3    Q    With regards to his income, were you aware that just even

4    in the last -- 2020, that he actually earned $95,000?

5    A    I was not aware.  No, ma'am.

6    Q    Okay.  Were you aware that he lives with a partner who

7    actually makes that kind of money as well?

8    A    No, ma'am.

9            MS. CROWDER:  Pass the witness.

10           THE COURT:  Thank you.  Any redirect?

11           MS. WALTERS:  Just very briefly, Your Honor.

12                       REDIRECT EXAMINATION

13   BY MS. WALTERS:

14   Q    Detective, when you were asked a question by Mr. C. Orji's

15   counsel about whether there -- whether there's anything

16   illegitimate about having a credit card reader in a business,

17   I wanted to ask you, was a credit card reader found or was it

18   a credit card skimmer?

19   A    It appeared to be a skimmer.

20   Q    And what's the difference between the two?

21   A    The reader, you can insert, it's meant to enter in a PIN,

22   whereas the skimmer, it's meant to record the information on

23   the card just through the swipe.

24   Q    And is it -- is a skimmer used often to put on an ATM

25   machine?  It's -- it's not the way a credit card reader is

1    used in a business, correct?

2    A    Correct.  It's not --

3    Q    It's put on top?

4    A    It's not a console.  It's not a console where you have the

5    numbers to enter in and the screen to display.  It's just a

6    swiping device.

7    Q    A swiping device?  And it's -- are you aware, in your

8    experience as a detective, of a credit card skimmer having

9    legitimate uses?

10   A    I don't want to make a declarative statement --

11   Q    Okay.

12   A    -- a hundred percent either way.  Are there potential

13   legitimate reasons to possess it?  Perhaps.  My experience,

14   typically, those reasons are illegitimate.  They're meant for

15   fraud and for theft.

16   Q    And if it were a credit card skimmer that was found, would

17   it also be more suspicious that it was found in a bank bag

18   hidden in a freestanding printer?

19   A    Yes, ma'am.

20   Q    Okay.  Now, let's turn to a question about -- asked by Mr.

21   Moses' counsel regarding the fate Ghanaian passport.

22   A    Right.

23   Q    How did the Government -- how did agents learn of the fake

24   Ghanaian passport?

25   A    So, Mr. Moses, I referenced the victim, the female victim

1   that he had seduced with a romance scam and convinced her to

2   open up bank accounts in her name, convinced her to receive

3   victim funds, which she didn't know they were victim funds,

4   and then to funnel those proceeds to himself and to other co-

5   conspirators.

6        Mr. Moses, I believe it was his fiancée must have gone

7   through his phone and found this frequent contact with this

8   female victim.  We'll call her MK.  She actually reached out

9   to this victim and told her, you know, what are you doing with

10  my man?  Don't you know that he's, you know, with me?

11  Whatever.  And MK, this is news to her, and so they kind of

12  have an exchange back and forth.  Mr. Moses' fiancée says,

13  don't you know this was all a romance scam, and says, I can

14  prove that he's Oluwalobamise Moses, and sent to MK, the

15  victim, a copy, a picture of his Ghanaian passport, which

16  investigators were able to determine was a fake.

17  Q    So, then let's turn to a question asked by Mr. F. Orji's

18  counsel.  He asked about what was found at the house.  And I

19  wondered if you might check your notes or refresh your

20  recollection.  He asked whether firearms were found in

21  Frederick Orji's apartment.

22  A    I'm not aware of any firearms in F. Orji's apartment.

23  Q    And this is even in the -- even in the safe where the

24  $150,000 in cash was found, and passports?

25  A    I don't know about that.

1  Q   Okay.  And then let's turn to the last questions.  With

2  respect to Mr. Animashaun, you were asked about accounts that

3  he had, and I think there may have -- might have been some

4  confusion as to whether accounts he had were -- were current

5  or in the past.  Do you -- based on the search warrant, is

6  there information that he has current -- access to current

7  foreign bank accounts?

8  A   Yes.

9  Q   Okay.  Thank you.

10         MS. WALTERS:  No further questions for this witness.

11         THE COURT:  Any -- anything else from any of the

12  Defense Attorneys for this witness?

13         MR. COKER:  Briefly, Your Honor.

14         THE COURT:  All right.

15                    RECROSS-EXAMINATION

16  BY MR. COKER:

17  Q   Christopher Coker for Mr. Moses.

18  A   I'm sorry, sir.  I can't hear you.

19  Q   Oh.  Let me -- I'll just move over here.  It's hard for me

20  to look that way anyway.  Christopher Coker for Mr. Moses.

21  You talked about how the Ghanaian passport was, I guess,

22  identified to Mr. Moses, correct?  And you referred to the

23  lady as his fiancée?

24  A   I know there was some sort of dating relationship.  They

25  were married or engaged, something of that sort.

1    Q    Well, it was his ex-wife.

2    A    Okay.

3    Q    Would that -- would that make more sense?

4    A    That's certainly possible.

5    Q    Okay.  And his ex-wife and him did not separate on good

6    terms.  And his ex-wife was dealing in schemes and fraudulent

7    passports at the time.  Would that make sense, that he would

8    maybe not know about this passport, this Ghanaian passport

9    that she sent to him, if that was what she was doing at the

10   time, fraud, you know, fraudulently making -- making

11   fraudulent passports?

12   A    I'm not sure what his ex-wife is involved in or what the

13   nature of their relationship is, and I can't really speak to

14   whether or not she was involved in any sort of criminal

15   activity.

16   Q    Okay.  And you took his phone, correct, when -- during the

17   search warrant?

18   A    I believe his phone was seized.  Yes, sir.

19   Q    And you intend to search it.  Correct?

20   A    That's my understanding.

21   Q    Okay.  And when you search it, there -- if there's

22   information on there confirming that his ex-wife was just

23   trying to get him in trouble and was doing this in order to

24   get back at him, you would find that, too, correct?  If you

25   searched the phone?

1    A    Yes, sir.

2    Q    Okay.

3    A    I don't know the status of the device, but I'm sure if

4    he's willing to provide his password, the FBI would be more

5    than happy to look at that.

6    Q    Okay.  And you mentioned in this case there's not just

7    romance fraud but there's also ID fraud, correct?  ID fraud?

8    A    ID fraud?

9    Q    Yes.

10   A    Yes.  There's identity theft.  Yes, sir.

11   Q    Okay.  Identity theft.  And you've seen in cases where

12   it's just not victims?  Codefendants do it to other

13   codefendants, correct, because they have their information as

14   well sometimes, right?

15   A    That can happen.  Yes, sir.

16   Q    And so everything that you've seen with Mr. Moses, you've

17   never seen him do anything personally, it's just all through

18   computers and numbers and something that, you know, a

19   Match.com account that anybody can set up, correct?

20   A    Right, because we, like I said, we can't identify who's

21   behind the computer screen, but we can trace the money, and he

22   is a direct recipient of victim funds, and he was also in

23   possession of multiple pages of personal identifying

24   information, to include names, phone numbers, addresses,

25   Social Security numbers.

1    That's what leads me to believe that he's involved in this
2    scheme and not a victim.
3    Q    Yes.  But money can be sent to an account and he can take
4    that money out and give to somebody, right?
5    A    Yes, sir.
6    Q    Okay.  And so it might not -- it might not have benefited
7    him directly.  He might have gotten paid something for getting
8    in money and taking it out, but he might not be necessarily
9    the person who did it.  Right?
10   A    Right.  I don't know what his share was.  That's accurate.
11   Q    Okay.
12          MR. COKER:  Nothing further, Your Honor.
13          THE COURT:  All right.  You may step down,
14   Detective.  Thank you.
15          THE WITNESS:  Thank you, ma'am.
16      (The witness steps down.)
17          THE COURT:  Anything else from the Government?
18          MS. WALTERS:  No, Your Honor.  The Government rests.
19          THE COURT:  All right.  Mr. Cunningham, anything from
20   -- for Mr. Orji?
21          MR. CUNNINGHAM:  Yes, Your Honor.
22          THE COURT:  Mr. C. Orji?
23          MR. CUNNINGHAM:  I'd call the first witness, Mr. Gary
24   Davis.
25          THE COURT:  All right.  Mr. Davis, if you would

1    please come forward and raise your right hand for me.

2         (The witness is sworn.)

3              THE COURT:  Please be seated and please speak up into

4    that microphone for me.

5              GARY DAVIS, DEFENDANT C. ORJI'S WITNESS, SWORN

6                          DIRECT EXAMINATION

7    BY MR. CUNNINGHAM:

8    Q    Please state your name.

9    A    Gary Davis.

10   Q    And sir, would you detail for the Court your employment

11   and education background?

12   A    Certainly.  I'm an immigration lawyer.  I've been

13   practicing immigration law since 2000.  Graduated from the

14   University of Texas as an attorney.  I became board-certified

15   in immigration and nationality law in 2005.  And I've had my

16   own firm, Davis & Associates, since 2007.

17   Q    And do you know Mr. C. Orji?

18   A    I do.

19   Q    And how?

20   A    You said how?

21   Q    Yes.

22   A    He has been my client for immigration processing for over

23   ten years now, I believe.  So a long time.

24   Q    And would you please tell the Court his actual status to

25   be in this country?

1    A    Certainly.  There's a little bit of history, so if I go

2    too rambly, just let me know.

3         Basically, he entered the country legally, and by the time

4    he became my client he was facing deportation proceedings at

5    the time.  He was married to his spouse, who is in the

6    courtroom today.  He had filed an I-130 petition with

7    Immigration, which is the petition that is filed with U.S.

8    Citizenship & Immigration Services to pursue permanent

9    resident status.  Eventually, that application or petition was

10   approved.

11        He was then -- we had several hearings with Immigration

12   Court -- all of which he attended, by the way -- as well as

13   interviews with the Immigration Service, all of which he

14   attended.  And the Immigration judge, after meeting his wife,

15   understanding about their relationship, seeing the approved

16   petition from USCIS at the time, he terminated deportation

17   proceedings.

18        So I saw a report -- maybe I shouldn't speak to this --

19   but there was a report that said it was suspended, but all --

20   it's actually terminated.  He is --

21   Q    The report -- was the --

22             THE COURT:  Can --

23   BY MR. CUNNINGHAM:

24   Q    The probation officer does a very quick --

25   A    Oh, I see.

1          THE COURT:  I'm going to -- I'm going to stop right

2   there.  I'm going to ask you to please move the microphone

3   back over.

4          MR. COKER:  I'm sorry, Judge.  That's probably my

5   fault.  I moved it.

6          THE COURT:  Well, we're not -- there's not any fault

7   here.  We just need to be able to hear people.

8          MR. COKER:  Sure.  I can hear him.  Just, I'm sorry.

9          THE WITNESS:  So I apologize if I spoke out of -- out

10  of turn.  It wasn't my intention.  But --

11  BY MR. CUNNINGHAM:

12  Q    So, Mr. Davis, --

13  A    -- the termination is -- sorry.  Termination is the actual

14  term for what happened with the deportation case.  So that is

15  not currently pending with the Immigration Court.

16  Q    So, the Probation officer does a very quick summary for

17  the judge, and you take issue with the note on this that

18  deportation proceedings are suspended?  You were there; they

19  were actually terminated by --

20  A    Correct.

21  Q    -- the IJ, correct?

22  A    That is correct.  Yeah.  And they're no longer pending.  I

23  would think of suspension as some sort of administrative

24  closure or something where it's still pending but has been,

25  you know, delayed in some way or something like that.  But

1   that's not true.  It's actually been completely terminated, at

2   least at this point.

3          THE COURT:  I'm sorry.  You're -- I'm having trouble

4   understanding you.

5          THE WITNESS:  Oh, I apologize.  So, the deportation

6   proceedings that were in process against Mr. Orji were

7   terminated by the Immigration judge.  And since that time,

8   currently he has an application for permanent residence

9   pending with USCIS, as well as a petition through his spouse.

10  And the reason we had to refile that case is because, after

11  the approval of his first petition through his current spouse,

12  USCIS had some concerns about a previous marriage

13  relationship, and they revoked that approved petition, did not

14  opt to put him back in the deportation proceedings, and

15  instead we filed an appeal of that decision and we filed a new

16  petition for permanent residence, which is currently pending

17  with USCIS.

18       So, technically, his immigration status currently is

19  pending application for adjustment of status, which is the

20  technical term for a green card application, through his U.S.

21  citizen spouse, and he has employment authorization, which is

22  valid today.  In addition to that, he has filed -- I think it

23  expires in November or something.  And so he has filed an

24  application, and it's currently pending, to -- to, I guess,

25  extend or to renew that work authorization.

1   Q    And that most recent application, you received that back

2   on June 21st of '21 for his renewal --

3   A    For the renewal.  Yes, sir.  We --

4   Q    -- of his current --

5   A    We typically file the renewal five or six months in

6   advance of the expiration, just to give USCIS time to process

7   that application before the current one expires.

8   Q    And in this situation, who is better able to provide

9   current information, USCIS or ICE?

10  A    So, ICE and USCIS are both agencies under the Department

11  of Homeland Security.  However, ICE is responsible for

12  managing enforcement operations for DHS.  USCIS is responsible

13  for managing benefits applications.  And so the better source

14  for the information of what the current status is for Mr. Orji

15  in this particular case would be USCIS, not ICE.

16  Q    Would you explain to the Court the term detainers?

17  A    Absolutely.  So, this is my understanding from a

18  functional standpoint.  I know there's regulatory authority

19  and things like that for detainers.  But, functionally, the

20  way they work is when law enforcement agencies at any level

21  take someone into custody and they cannot confirm that the

22  person is a United States citizen, that leads to a detainer

23  being placed on them just as a matter of course.

24       And the purpose for the detainer is, if that law

25  enforcement agency or under whatever circumstances the person

Davis - Direct                        71

1  is going to be released from whatever custody, that agency is

2  responsible to notify ICE and give them 48 hours before that

3  person is released to decide whether or not they will come and

4  take that person into their custody.

5      If the 48 hours pass and ICE has chosen not to engage,

6  then the person is supposed to be released.  Doesn't always

7  happen, but often it does.  And if ICE does come and have a

8  communication with that person and decides to take them into

9  custody, at that point they can make their own determination

10  about whether or not to grant a bond, or we can -- we have the

11  option to go to an Immigration judge and ask for a bond

12  separately.

13      The detainer just is the functional mechanism that allows

14  ICE to be notified before that law enforcement agency that has

15  the person in their custody and who also is not a U.S. citizen

16  is released back into the public.

17  Q    You understand the decision that Judge Ramirez has to make

18  today?  If she grants Mr. C. Orji a bond in this matter, and

19  whatever conditions she wishes to place on him, what, in your

20  opinion, will happen when he is released from federal custody

21  in this case?

22  A    Well, my expectation would be, considering the gravity of

23  the charges and the size of, you know, the group that's been

24  indicted and that kind of thing, that ICE is going to have an

25  interest in having a conversation with Mr. Orji.

1      They will review his history.  They'll see that he has no

2  criminal convictions in the past.  I assume also -- some of

3  you may have heard that there was a -- from -- Secretary

4  Mayorkas released a policy memorandum yesterday, as DHS

5  Secretary, basically instructing ICE on -- under what

6  circumstances they should be exercising their authority to

7  detain someone or to pursue deportation against someone.  And

8  based on those instructions, based on the fact that he has no

9  criminal history, and other circumstances, like the fact that

10  he has significant family ties, including his spouse and his

11  children that are all U.S. citizens, the fact that he's always

12  appeared at every hearing or interview that the Government has

13  ever scheduled with him, and those kinds of considerations,

14  and the fact that this criminal case is pending, not -- he's

15  not been convicted of anything at this point, but it's a

16  pending charge, and he has a benefits application pending with

17  USCIS, my expectation is that, at the very least, they will

18  set a bond for him.

19      Now, they may choose to not, and then we'd have to an

20  Immigration judge.  But I also feel very confident, if we had

21  to go take this matter to an Immigration judge, for all of

22  those reasons -- oh, by the way, there's one other reason.  If

23  he is back into deportation proceedings, because he could be,

24  he's overstayed his visa, right?  He's deportable from the

25  country as a visa overstay.  However, he's also eligible for a

1    benefit through the Immigration system through his wife, who

2    has the pending petition.  If it's ultimately approved, he can

3    become a permanent resident through that.

4         But also there's a benefit to people facing deportation.

5    It's called cancellation of removal for non-permanent

6    residents.  And it's basically a green card through time and

7    with significant family ties to the U.S., which Mr. Orji has

8    all of those, and no barring criminal record, which at this

9    point he does not have.  So he would also be eligible to seek

10   relief from the Immigration judge in that forum or through his

11   wife and her petition.

12        So, because he has a benefit available to him to legalize

13   his status on a permanent basis -- two, in fact -- because of

14   the family ties, no criminal history, at least no criminal

15   record of convictions, that I think the Immigration judge

16   would be willing to grant some sort of bond in his situation,

17   if the judge found it necessary.

18        But, again, when he meets with ICE and they see that

19   history, the recent policy memo from Secretary Mayorkas and

20   all those things, I think there's a decent chance that they

21   decide that they'll keep monitoring him in some way as they

22   watch this criminal matter develop, but then they probably

23   would -- would choose to release him, or at least set a bond

24   on their own.

25   Q    Thank you.

1              MR. CUNNINGHAM:  Pass the witness.

2                          CROSS-EXAMINATION

3    BY MS. WALTERS:

4    Q    So, if I understood you correctly, he has an application

5    for a permanent residency status, --

6    A    Correct.

7    Q    -- correct?

8    A    That's correct.

9    Q    And that does not protect him from deportation, does it?

10   A    It does, actually.

11   Q    No, actually, excuse me, it -- you can't have -- you -- it

12   is possible to have both an application pending and also have

13   deportation proceedings.

14   A    Well, yes, he could be put into deportation proceedings.

15   Q    Thank you.

16   A    Yes, that's correct.

17   Q    So he is a visa overstay?

18   A    That's correct.

19   Q    And you understand that he does have a detainer from ICE

20   today?

21   A    Yes.

22   Q    Regardless of what happens in the future, he has a

23   detainer today?

24   A    Yes.

25   Q    Okay.

1              MS. WALTERS:  No further questions for this witness.

2              THE COURT:  Thank you.  Mr. Davis, you may step down.

3              THE WITNESS:  Thank you, ma'am.

4              THE COURT:  Oh, is there any redirect?

5              MR. CUNNINGHAM:  No, Your Honor.

6              THE COURT:  All right.  You may step down.

7              THE WITNESS:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9         (The witness steps down.)

10             THE COURT:  Anything else on behalf of Mr. C. Orji?

11             MR. CUNNINGHAM:  Call his wife.  Alicia Orji.

12             THE COURT:  All right.  And remember, you have a

13  fifteen-minute limit, and you're close.

14             MR. CUNNINGHAM:  I know.  He's longwinded.  Excuse

15  me.

16             THE COURT:  If you'll please raise your right hand.

17        (The witness is sworn.)

18             THE COURT:  Please be seated.

19        ALICIA ORJI, DEFENDANT C. ORJI'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21  BY MR. CUNNINGHAM:

22  Q    Please state your name for the record.

23  A    Alicia Orji.

24  Q    And how are you employed?

25  A    I work at a community college, Dallas Community College.

1    I'm an adjunct professor.

2    Q    And you grew up in Dallas?

3    A    Yes, I did.

4    Q    Went to Booker T. Washington?

5    A    Yes, sir.

6    Q    And what's your education background?

7    A    I graduated from the University of Oklahoma, and I also

8    traveled to New York where I studied with Alvin Ailey American

9    Dance School.  And then from there I graduated from Texas

10   Women's University with an MFA degree.

11   Q    And you have a master's also?

12   A    Yes, I do.

13   Q    You understand we've got a time limit here.  How long have

14   you and your husband, C. Orji, been married?

15   A    Almost eleven years.

16   Q    How many children do you have?

17   A    We have three children.

18   Q    What type of business does he have?

19   A    My husband has a car dealership, a used car dealership.

20   Q    And how many cars were seized as a result of the search

21   warrant?

22   A    I would say about eighty.

23   Q    These -- he had notes that he was collecting weekly or

24   monthly payments for these cars, correct?

25   A    That's correct.

A. Orji - Direct                                77

1    Q    And all of this now has fallen on you?

2    A    Yes.

3    Q    Can you keep up?

4    A    I'm struggling.

5    Q    You've got a full-time job, three kids, and now --

6    A    Yes.

7    Q    -- a you-tow-'em lot that you're trying to find these

8    notes and collect payments, correct?

9    A    Yes, sir.

10   Q    You heard your lawyer, our immigration lawyer, testify

11   that he's eligible to become a permanent legal resident?

12   A    Yes.

13   Q    He hasn't left this country in how many years?

14   A    Since two thousand -- never.  Since he's been here.

15   Never.  He hasn't.  He was here 2007, I think.

16   Q    You brought his current Nigerian passport here to court

17   today?

18   A    Yes.

19   Q    You understand if the judge releases him you're going to

20   have to post this with the Clerk of the Court?

21   A    Yes.

22   Q    And he will not be able to leave the Northern District of

23   Texas?  You understand that?

24   A    Yes.

25   Q    How long have you owned your home that you live in in

1    DeSoto?

2    A    Since 2013.

3    Q    And have -- and you and your husband and three kids live

4    in the house that you own?

5    A    Correct.

6    Q    He's never been to Nigeria or left this country?

7    A    No.  Nothing.

8    Q    Have you?

9    A    No.

10   Q    Does he have any place to go?

11   A    No, sir.

12            MR. CUNNINGHAM:  Pass the witness.

13                      CROSS-EXAMINATION

14   BY MS. WALTERS:

15   Q    Were you at the house when the search warrant was

16   executed?

17   A    Yes, I was.

18   Q    And did you see agents leave with a variety of different

19   objects?

20   A    No, I did not.

21   Q    So you didn't see agents leave with -- with anything?

22   A    They allowed me to leave to take my children to school.

23   Q    Okay.  Are -- and are you aware that your husband had two

24   firearms?

25   A    No.

1   Q    You've never seen him with firearms?

2   A    I've seen one, yes.

3   Q    Okay.

4   A    At the -- yes.  At -- not at home.  Yes.

5   Q    Not at home, but in your husband's possession?

6   A    Yes.  Because he's been robbed before at his shop.  Yeah.

7   Q    Okay.

8           MS. WALTERS:  No further questions for this witness.

9           THE COURT:  Anything else?

10          MR. CUNNINGHAM:  No, Your Honor.

11          THE COURT:  Ms. Orji, you may step down.

12          THE WITNESS:  Thank you.

13          THE COURT:  Thank you.

14       (The witness steps down.)

15          THE COURT:  Anything else on behalf of Mr. C. Orji?

16          MR. CUNNINGHAM:  No, Your Honor.

17          THE COURT:  All right.  I forgot the order.  Was it

18  Mr. Moses who was next?

19          MR. COKER:  Yes, Your Honor.  No witnesses.

20          THE COURT:  All right.  Mr. Coker?

21          MR. COKER:  Yes, Your Honor.  No witnesses.

22          THE COURT:  Okay.  And then for Mr. F. Orji, Mr.

23  Watson?

24          MR. WATSON:  Yes, Your Honor.  May it please the

25  Court.

1          THE COURT:  Can we get the microphone over by you?

2          MR. WATSON:  Yes, Your Honor.  With leave of the

3    Court, I have a -- I have two copies of a -- of a passport.

4    I've got a Nigerian passport, a U.S. passport, and a

5    certificate of naturalization, and I'd like to -- I don't have

6    extra copies, but I'll show it to the prosecutor right now and

7    then present it to the Court.

8          THE COURT:  Well, it would have been nice to have

9    shown it to the prosecutor before, but let's do that.

10         MR. WATSON:  I know, Judge.  I -- it's -- but that's

11   how life is.  Or it is for me, anyway, Judge.

12      (Pause.)

13         MR. WATSON:  May I approach, Judge?

14         THE COURT:  You may.

15      (Pause.)

16         MR. WATSON:  And Judge, what I'd like to do, if I

17   may, is to make copies for everybody and get those back.

18      (Pause.)

19         THE COURT:  Okay.

20         MR. WATSON:  And Judge, I'd like for you to, I guess,

21   admit it for the record, and I'll supplement them or give them

22   --

23         THE COURT:  You --

24         MR. WATSON:  That's what I'll do, is --

25         THE COURT:  You can file them of record if you would

1    like.  But it would be good to provide copies to the

2    Government.

3              MR. WATSON:  Yes.

4              THE COURT:  I've seen them.

5              MR. WATSON:  That's --

6              THE COURT:  But if you're formally moving to --

7              MR. WATSON:  Yes.

8              THE COURT:  -- to admit them, then this is time for

9    us to take that up.

10             MR. WATSON:  Yes.  Yes, I move to admit these three

11   exhibits into evidence on behalf of Freddy -- of Frederick

12   Orji in this hearing before the Court.

13             MS. WALTERS:  No objection, Your Honor.

14             THE COURT:  Admitted.

15        (Defendant F. Orji's Exhibits 1 through 3 are received

16   into evidence.)

17             THE COURT:  Anything else?

18             MR. WATSON:  No, Your Honor.

19             THE COURT:  All right.  For Mr. Animashaun?

20             MS. CROWDER:  Your Honor, I'd call Light (phonetic)

21   Osasona.

22             THE COURT:  Okay.  And, ma'am, if you would please

23   come forward and raise your right hand for me.

24        (The witness is sworn.)

25             THE COURT:  All right.  I'm going to ask you to be

1   seated and to please speak up.  Your voice is very soft, so

2   I'm having a hard time hearing you, so speak up.

3          THE WITNESS:  Okay.

4       IMOLEAYO OSASONA, DEFENDANT ANIMASHAUN'S WITNESS, SWORN

5                       DIRECT EXAMINATION

6   BY MS. CROWDER:

7   Q    Could you state your name for the record and spell it,

8   please?

9   A    My name is Imoleayo Osasona, preferably called Light.

10  Q    Okay.

11  A    I-M-O-L-E-A-Y-O.  And my last name, O-S-A-S-O-N-A.  Okay.

12  Q    And you are -- what is your relationship to David

13  Animashaun?

14  A    I'm his partner, but he usually like to call me sister.

15  Q    Okay.  But typically he calls you his sister but you're

16  not really his biological sister; is that correct?

17  A    Yes.  Yes.

18  Q    Do you all have a child together?

19  A    Yes.

20  Q    Okay.  And where do you -- and how -- what's your child's

21  name and age?

22  A    My child's name is David Tinilolua (phonetic) Osasona, and

23  he turned one on Wednesday.

24  Q    Okay.  Now, with regards to -- I went over the Pretrial

25  Services report with you that -- where a pretrial officer

1   interviews David prior to coming to the detention hearing; is

2   that correct?

3   A    Yes.

4   Q    And there are things -- it stated that they called you but

5   you didn't answer.  But your phone was taken when they did the

6   search warrant at your home; is that correct?

7   A    Yes.  My phone was taken.

8   Q    Okay.  So you're here to verify the information that was

9   requested by the Pretrial Services report; is that correct?

10   A    Yes.

11   Q    Or officer.  Where do you reside?

12   A    Currently, we reside at 204 Daylily Drive, Wylie.

13   Q    And who owns that home?

14   A    Myself and David.

15   Q    And when did you both buy this home?

16   A    We closed the home January 2021.

17   Q    And you and I have had an opportunity to -- well, you

18   submitted documents to me to provide to this Court at this

19   hearing; is that correct?

20   A    Yes.

21   Q    And to save time, we're just going to go through them, I'm

22   going to ask you questions, and at the end I will admit them,

23   I will request that the judge admit them into evidence.  Is

24   that okay with you?

25   A    Yes.

1  Q    Okay.  Did you print out a property search document from

2  the Collin County Appraisal District that states that you and

3  David actually own this home together?

4  A    Yes.

5  Q    Okay.  And I'm going to, at the end, that would be

6  Defendant's Exhibit No. 1.

7        How long have you -- and how long have you all owned that

8  home?

9  A    Eight months.

10 Q    Okay.  Prior to purchasing that home, where did you and

11 David live?

12 A    We live in Garland.  6205 North President George Bush

13 Highway.

14 Q    Okay.  And that address is actually listed in the Pretrial

15 Services report; is that correct?

16 A    Yes.

17 Q    Okay.  How long did you live there?

18 A    Two years.

19 Q    Okay.  Now, what -- do you have any education?

20 A    Yes.

21 Q    And could you tell the Court?

22 A    I studied educational management in Nigeria in -- it's a

23 state university.  And after that I went to Istanbul, Turkey,

24 and I have my master's in political science and international

25 relations.

1    Q    Okay.  Are you aware of David's education?

2    A    Yes.

3    Q    And what is that?

4    A    He has a bachelor's degree.

5    Q    And do you know what he has a bachelor's degree in?

6    A    He has a bachelor's degree in management.

7    Q    Okay.  With regards to David's passport, were you aware

8    that he had a passport?

9    A    Yes.

10   Q    Okay.  And do you know where it is?

11   A    It was taken by the FBI.

12   Q    Okay.  And do you know if it's expired?

13   A    Yes.

14   Q    How do you --

15   A    2018.

16   Q    How do you know it's expired?

17   A    Because he tried to renew it and he had an appointment in

18   Atlanta and then COVID, he wasn't able to go.

19   Q    Okay.  To your knowledge, has David left -- when was the

20   last time that David left the country?

21   A    In 2017 when his father died.

22   Q    Okay.  And the purpose was to bury his father?

23   A    Yes.

24   Q    Where are you employed?

25   A    I'm employed with Covia Solution as a due diligence

1    underwriter.

2    Q    Okay.  And how much money do you make?

3    A    I make over $6,000.  Monthly.

4    Q    Six thousand monthly?

5    A    Yes.

6    Q    Are you aware of David's employment status?

7    A    Yes.

8    Q    And what is that?

9    A    He's an internal auditor, and his contract with Robert

10   Half just ended last -- two weeks ago on Friday.

11   Q    Okay.  And you all, when purchasing your home in February

12   of 2021, did you both have to provide income verification in

13   order to get this loan?

14   A    Yes.  We provided two years.

15   Q    Okay.  And how much was your home?

16   A    Our home was 445.

17   Q    Okay.  So, together, you both make close to $200,000?

18   A    Yes.

19   Q    Okay.  Is your -- is David also employed with his church?

20   A    Yes.

21   Q    And is that your church as well?

22   A    Yes.

23   Q    Okay.  Did you provide pictures for me from the actual

24   church website that actually has him with a guitar and in a

25   band for that church?

1   A    Yes, I did.

2   Q    Okay.  And did you also provide to me a 1099 from the

3   church that actually states how much money he earns from the

4   church?

5   A    Yes.

6   Q    And is that approximately in the amount of $13,256.67 in

7   2017?

8   A    Yes.

9   Q    Okay.  And did you also provide to me ADP payroll stubs

10  that verify that David earns $50 an hour?

11  A    Yes.

12  Q    Okay.  And his paychecks that you've provided to me and

13  that I've already provided to the Government, he grossed -- he

14  -- his checks are anywhere between $3,000 to $4,000 every pay

15  period?

16  A    Yes.

17  Q    Do you have any concerns with regards to David's health?

18  A    Yes.

19  Q    And what is that?

20  A    I have documents from doctor's appointment that shows that

21  David has high blood pressure and Stage 3 kidney disease.

22  Q    Okay.  And so you've actually provided me a document from

23  the Dallas Nephrology Associates that actually states that he

24  has been diagnosed with chronic kidney disease, Stage 3.  Is

25  that correct?

1    A    Yes.

2    Q    And we will provide that over to the judge here; is that

3    correct?

4    A    Yes.

5    Q    You've also provided me documents that you both own --

6    well, you both have two cars in your name; is that correct?

7    A    Yes.

8    Q    Okay.  And you provided me those documents.  Both cars are

9    in your name; is that correct?

10   A    Yes.

11   Q    And in --

12   A    My name and David's name.

13   Q    And David's name.  And what cars are those?

14   A    That's a Toyota Highlander and a Mercedes.

15   Q    Okay.  And you both -- so they are leased documents, is

16   that -- I mean, leased cars; is that correct?

17   A    Yes.

18          MS. WALTERS:  I'm sorry.  Could you repeat that?  I

19   missed that.  I just didn't hear it.

20          MS. CROWDER:  They're leased cars.

21          MS. WALTERS:  They're leased cars?

22          MS. CROWDER:  Leased cars.

23          THE WITNESS:  Lease agreement.

24          MS. WALTERS:  Okay.

25          MS. CROWDER:  Yes.

1   BY MS. CROWDER:

2   Q    Do you have any concerns that David will flee the country

3   or flee -- or flee the country and not show up to court?

4   A    No.

5   Q    Okay.  Would you -- are you agreeing to be a third-party

6   custodian in this case?

7   A    Yes.

8   Q    Okay.  Would you assist David in coming to court or

9   anything that this -- or any condition that the Judge believes

10  is appropriate if he is released today?

11  A    Yes.

12  Q    Now, the Pretrial Services report states that he -- it

13  states that he has a wife; is that correct?

14  A    Yes.

15  Q    Okay.  And does he have a wife?

16  A    Yes.

17  Q    Okay.  And are they separated?

18  A    Yes.

19  Q    And where does his wife live?

20  A    Euclid, Ohio.

21  Q    In Ohio?

22  A    Yes.

23  Q    Okay.  They do not live in your home in Wylie?

24  A    No.

25  Q    So that was some -- that was a miscommunication somehow?

1   A    Yes.

2        MS. CROWDER:  Your Honor, at this time I'd like to

3   admit Defendant's Exhibit 1 through 8.  They have all been

4   previously --

5        THE COURT:  Been previously--?

6        MS. CROWDER:  I'm sorry.  They've all been previously

7   presented to the federal prosecutor.

8        THE COURT:  All right.  Any objection?

9        MS. WALTERS:  No, ma'am.

10       THE COURT:  Admitted.

11    (Defendant Animashaun's Exhibits 1 through 8 are received

12   into evidence.)

13       MS. CROWDER:  My I approach, Your Honor?

14       THE COURT:  You may.

15       MS. CROWDER:  For the record, it's Defendant's

16   Exhibits 1 through 8.

17   BY MS. CROWDER:

18   Q    All right.  Are you asking this Court to release David

19   into your care?

20   A    Yes.

21   Q    And is that so that he can get proper care for his Stage 3

22   chronic kidney disease?

23   A    Yes.

24   Q    Okay.  And also so that he can start working?

25   A    Yes.

```
 1   Q    Okay.

 2             MS. CROWDER:  Pass the witness.

 3             THE COURT:  Cross?

 4             MS. WALTERS:  No cross, Your Honor.

 5             THE COURT:  All right.  You may step down.  Thank

 6   you.

 7             THE WITNESS:  Thank you.

 8        (The witness steps down.)

 9             THE COURT:  Anything else on behalf of Mr.

10   Animashaun?

11             MS. CROWDER:  No, Your Honor.

12             THE COURT:  All right.  Did I miss anybody?

13        (No response.)

14             THE COURT:  No?  Okay.

15             MR. WATSON:  One second, Your Honor, if I may.  I

16   think I've got a few minutes left, I hope.  Do -- if -- is --

17   if the Court -- if it would help the Court, I do have a

18   civilian.  He's a -- he's a Nigerian individual.  He lives in

19   the U.S.  He's not a citizen.  We would do a proffer that he

20   is willing to be a custodian or a surety for my client.

21             THE COURT:  All right.  So what would you like to do?

22             MR. WATSON:  I'll call him as a witness.

23             THE COURT:  All right.  If you would please raise

24   your right hand.

25        (The witness is sworn.)
```

1              THE COURT:  Please be seated and please speak up into

2    that microphone for me.

3       SOMTOOCHUKWU CHIKEBEBE, DEFENDANT F. ORJI'S WITNESS, SWORN

4                          DIRECT EXAMINATION

5    BY MR. WATSON:

6    Q    Sir, you and I met this morning, correct?

7    A    Yes.

8    Q    And I want you to spell your first name slowly.

9              THE COURT:  I'm going to ask you to stop for a

10   minute.

11        (Pause.)

12             THE COURT:  Okay.  Got it.

13   BY MR. WATSON:

14   Q    Okay.  Sir, I want you to spell your first name slowly for

15   the record and then spell your last name slowly.

16   A    S-O-M-T-O-O-C-H-U-K-W-U, C-H-I-K-E-B-E-B-E.

17   Q    And how long have you known Freddy Orji?

18   A    For over two years.

19   Q    Okay.  And you are applying -- or, you have your green

20   card, correct?

21   A    Yes.

22   Q    And if the Court -- if Judge Ramirez was willing to allow

23   him to get out on supervised -- or not on supervised release,

24   but get out on bond, would you represent to the Court that you

25   would report to the Court if he indicated that he was going to

1    leave town or did leave town?

2    A    Yes.

3    Q    And if the Court asks you to check in periodically with

4    the Court about where he is and what he's doing, would you be

5    willing to do that?

6    A    Yes.

7    Q    Do you -- and you know where he lives?

8    A    Yes.

9    Q    And you're able to communicate with the Probation

10   Department and, like we talked about in the hallway, basically

11   act a surety and assure the Court that he won't -- he won't be

12   a law breaker, he won't leave the -- he won't leave the

13   district, and he'll report as the Probation Department directs

14   him to report; --

15   A    Yes.

16   Q    -- is that correct?

17   A    Yes.

18   Q    And he'll make all his court dates, correct?

19   A    Yes.

20   Q    And like we realized earlier, he is a U.S. citizen,

21   correct?

22   A    Yes.

23            MR. WATSON:  That's all I have, Judge.

24            THE COURT:  All right.  Any cross-examination?

25            MS. WALTERS:  No, Your Honor.

1              THE COURT:  All right.  You may step down, sir.

2    Thank you.

3              MR. WATSON:  Thank you, Your Honor.

4              THE WITNESS:  Thank you.

5         (The witness steps down.)

6              THE COURT:  Let's hear argument.

7              MS. WALTERS:  Okay.  Your Honor, if I might have just

8    a moment while I'm organizing.

9         (Pause.)

10             MS. WALTERS:  Your Honor, the Government believes

11   that there are no conditions or combination of conditions that

12   will reasonably assure the appearance of these -- any of these

13   defendants or the safety of another person or the community if

14   they are released.

15        I thought I would go in order, in alphabetical order,

16   starting with Mr. Animashaun.  With respect to Mr. Animashaun,

17   the greatest concerns are that he has used other names --

18   David Brown, David Benson.  There were receipts found in the

19   car in one of these names.  So this is not as though it is --

20   these are names that are the leaseholders or someone else.

21   These are currently -- these are current names that have

22   current -- where there is current information found two weeks

23   ago during the search warrant.

24        But more important than those two names are the multiple

25   pages of personal identifying information at the house.  It

1   doesn't matter whether the names are names of U.S. citizens or

2   foreigners -- it appears that they were Chinese -- but it was

3   multiple note pages of PII with Chinese names, FICO scores,

4   amounts next to them.  That's extremely concerning, because

5   that is part and parcel of what the schemes, whether they're

6   romance or unemployment fraud or business email compromise,

7   need to perpetrate.  They need the PII, and Mr. Animashaun has

8   it currently.

9       He has current bank accounts in Nigeria.  He also has --

10  he's the one who had the library of books of persuasion.  Now,

11  the Government does not suggest that the books are illegal.

12  The Government suggests that he's a professional fraudster.

13  He is someone who is learning how to persuade individuals,

14  which is what one needs to do to be a successful romance

15  scammer.  And he is someone who directly received romance scam

16  victim funds.

17      He had only a few hundred dollars in net income in 2017,

18  and yet more than $200,000 of victim funds in cash in one

19  single -- deposited into one single account.

20      When looking at the totality of those circumstances, he is

21  a financial danger.  It is ongoing.

22      And finally, I would like to note that Mr. Animashaun may

23  be living currently with his wife, but if we look at Page 2 of

24  the Pretrial Services report, there are multiple addresses in

25  a very short period of time.  If we -- I believe that there

1    are at least five addresses over the course of just a few

2    years.

3         That presents a significant concern that he doesn't

4    actually have a stable residence, that he doesn't -- and that

5    he is willing to go somewhere else.

6         Because of the lack of current employment, significant

7    ties to Nigeria with the bank accounts, the possession of

8    current PII, and his prior receipt of victim funds, the

9    Government believes that there are no conditions or

10   combination of conditions that can reasonably assure the

11   safety of the community or his appearance in Court.

12        Moving to Mr. C. Orji, I note first that even Mr. C.

13   Orji's witness, an immigration attorney, acknowledged there is

14   a detainer in place.  He is someone who has -- who was

15   indicted for conduct in 2017, but since then admitted to an

16   undercover agent in a meeting that he participated in

17   cybercrime and fraud and cleans money in 2019.

18        He's had 24 bank accounts.

19        When the search warrant was run, there was an ID in a fake

20   name but with his photo on it, and a fake name with a debit

21   card on it.  Again, the use of aliases doesn't merely indicate

22   the risk of flight, but it makes it incredibly difficult for

23   law enforcement to find this individual if he is released into

24   the community.

25        But in addition to the fake name and the fake debit cards,

1   there was the -- there were the materials that were found at

2   OCS Motors, his business, that included Green Dot cards,

3   credit card skimmers, a credit card writer, and a passport for

4   someone else.  This is very unusual for someone who would just

5   be running a car dealership.  He had a passport for someone

6   else.  Agents also seized two guns from Mr. Orji at his house.

7          Now, there was quite a bit of testimony about how Mr. Orji

8   has repeatedly appeared in front of immigration proceedings.

9   We don't doubt that.  He benefits when he appears in front of

10  immigration judges and CIS officers because he is seeking a

11  benefit and he must appear in front of them to obtain that

12  benefit.  He's in a very, very different position here when

13  he's been charged not just with conspiracy to commit wire

14  fraud but also money laundering and faces 30 years in prison.

15         Given that he has multiple accounts, is willing to use

16  fake names, and has a plethora of material that can create or

17  facilitate fraud with the Green Dot cards, the credit card

18  skimmers, and has admitted committing cybercrime, fraud, and

19  cleaning money, we do not believe that he would be likely to

20  appear in the future if released.  And nevertheless, we are

21  confident that ICE would appear to pick him up on the detainer

22  should he be released from this Court.

23         Finally, let's turn next to Mr. F. Orji.  Mr. F. Orji has

24  had fifteen trips since becoming a legal permanent resident,

25  including travel to Nigeria in 2021.  When his brother's

1    phone, E. Orji, Emanuel Orji's phone was seized -- that's the

2    first one that has been analyzed -- there were current chats

3    with his brother in 2021 about what agents believe to be

4    structuring.  Driving to different locations to pick up money

5    orders or cashier's checks or postal money orders in a short

6    succession of time appears to be structuring, which suggests

7    he's continuing to engage in conduct in which he needs to hide

8    the money.  He needs to figure out how to conceal what he's

9    doing from law enforcement.

10        But beyond that, for an individual who was recently

11   unemployed, according to Texas Workforce Commission, he had

12   $150,000 in cash in a safe as well as 48,000 naira.

13        And finally, the 250 stored-value cards.  That's an

14   enormous amount of -- that's an enormous amount of stored-

15   value cards for any one person to have.  He received victim

16   funds directly, and has also been charged in money laundering.

17   Given that he now faces 30 years in prison, I don't believe

18   that he would be likely to appear, and he certainly has the

19   means and the familiarity to travel abroad.

20        Then, turning to the last individual, Mr. Moses, we have

21   Mr. Moses as a direct recipient of victim funds and also

22   someone who directed others, directed another victim, whose

23   initials were mentioned, MK, to open bank accounts and receive

24   and send money.  So he was very much involved in the scheme.

25   But also we know that he has a fake Ghanaian passport, a

1  Malaysian driver's license, has used aliases that agents are

2  familiar with, including George Mike and George Williams.

3      There's no indication of employment under Texas Workforce

4  Commission since second quarter of 2020.  He has multiple

5  accounts.  He had the phone -- the multiple unused SIM cards,

6  which could easily facilitate the biggest concern agents have,

7  which is the extensive PII with names, addresses, birthdates,

8  Social Security numbers, sometimes bank numbers, and at the

9  top of those notes, the phone number to call from.

10      So this isn't something that it's just it's interesting

11  that he has.  This is a scheme.  This is current.  And he

12  knows that he needs to be savvy about how to commit these

13  crimes by dialing from different numbers.

14      For these reasons, we don't believe that Mr. Moses can be

15  released on any conditions into the community.

16      Oh, and let me, before I -- before I complete this, let me

17  make sure that there's nothing else.

18      (Pause.)

19          MS. WALTERS:  Your Honor, I have nothing else.

20          THE COURT:  Mr. Cunningham?

21          MR. CUNNINGHAM:  I don't like sitting down, but I

22  will, Judge.

23      Obviously, the tail wagging of the dog for Mr. C. Orji is

24  the immigration issue.  I think we have brought clear and

25  convincing evidence to the Court that he is a legal status,

1   that he has a work permit, and that he is in process of having

2   that renewed.  Just yesterday, Secretary Mayorkas issued new

3   guidelines for the ICE agents to review cases just like this.

4   It's on Page 1A of *The Dallas Morning News* of his statements

5   that he made yesterday directing ICE agents to release people

6   if they are non-violent, non-sex-predator felons.

7       He is charged with a financial crime.  He has lived in his

8   home here in Dallas for over a decade.  He has a wife, three

9   kids, and his own business.  You heard that the Government

10   seized eighty vehicles from his lot.  He still has those notes

11   that he -- for the cars that he has sold and are out on the

12   street that he needs to collect those funds from the people

13   who have purchased cars from him.

14       So he has -- the Government made a big deal about he had a

15   shotgun.  Well, he's been robbed.  When people came, robbed

16   him at his store, or at the car lot, he got a shotgun.  This

17   is Texas.  That's not unusual.

18       And we have proven that he has nowhere to go.  He has not

19   left this country since he came here over fifteen years ago.

20       Judge, this person does not pose a danger to our community

21   because I know you'll -- I know you'll -- if you order a bond,

22   that you won't let him open any new bank accounts.  He'll be

23   able to run his business and go home and that's it.

24       And especially when we're talking about these type of

25   financial crimes, the Government will typically give me a

1   here's a terabyte of information, you know, eat this.  And

2   when you're trying to evaluate this type of case with someone

3   who is in custody in Limestone County or Johnson County and

4   you try to do it, you know, either on Zoom or you go there

5   through the glass, it is very, very, very difficult to prepare

6   an adequate defense for this type of case.

7      He's not going anywhere but to DeSoto.  And if you tell

8   him to be here, he will be here.

9      Thank you, Your Honor.

10      MR. COKER:  Yes, Your Honor.  I'd like to proffer the

11   Pretrial Services report.  And just to point out, he's been in

12   this country since 2016.  He's a legal -- a lapper.  And he

13   has two children.  His -- he has a five-year-old who has

14   health problems.  He takes care of him.  He has to basically

15   feed him.  Right now, because of his wife's situation with a

16   new job, she's unable to take him to school, so he's not in

17   school.  He's being cared for by friends of his who -- he's

18   not eating.  At least, that's what his friends are telling

19   him.  He's -- he just wants to take care of his son.  He needs

20   to be out of jail to do that.

21      Also, he doesn't have the international travel that a lot

22   of other people have.  He went one time to Nigeria with his

23   new wife he has a one-year-old child with to be at the

24   memorial service for his mother and he got -- and she got to

25   meet his brother and sister in Nigeria.  That's the only time

1  he's gone back there.

2     He's -- he's basically -- he has his application in for

3  citizenship here.  He wants to live in this country.  He does

4  not want to live in Nigeria.  He has no reason to go back

5  there.  And he wants to take care of his child and he wants to

6  continue his life with his wife.  They are separated right

7  now, but they have been working at some sort of reunification.

8  His wife was not able to be here today because, like I said,

9  she started a new job.

10     He has his own business.  That's why he doesn't have

11  anything on the Texas Workforce Commission.  He's filed his

12  taxes.  If he's, you know, this crazy -- this fraudster who

13  goes out and then defrauds, you know, hundreds of thousands of

14  dollars, he works as an -- he works -- he filed his taxes.  He

15  works as an Uber driver and for Door Dash.  So he's -- he's

16  making money selling his cars, but also sometimes, you know,

17  he comes up a little short and he has to do other jobs, odd

18  jobs.

19     The things the Government talked about as far as direct

20  recipients of victims' funds and he directed others, again,

21  that -- that's through the Internet.  It's through anybody who

22  could make an account.

23     As far as aliases, one of them they mentioned is the one

24  on the Match.com account.  And, you know, that, again, that

25  could be anybody.

1     Then talked about -- they talked about the SIM cards and

2  that indicates that he is continuing fraud.  He would offer

3  that they are prepaid cards that he talks to with his brothers

4  and sisters with.  I think they said there are six credit

5  cards in his own name, one not in his name, and then the six

6  Green Dot cards, which, you know, that's not necessarily

7  indicative of fraud.  You know, something like -- you know, if

8  you had a whole lot more.  But six, I don't think it gets you

9  there.

10     So, as far as continuing danger, I don't believe he is.

11  And as far as, you know, them not finding his passport, his

12  passport is at a bank in a deposit box and he's more than

13  willing to turn that over.

14     I think there are ample conditions that could be put on

15  him that would basically show the Court that he would be here

16  and he's not a flight risk.

17     Thank you, Your Honor.

18          THE COURT:  Mr. Watson?

19          MR. WATSON:  Yes, ma'am.  Your Honor, I'd like to

20  start out by mentioning, number one, that he is a U.S.

21  citizen, against the certainty professed by the U.S.

22  Government.  He actually is a U.S. citizen.

23     He has no aliases.  He has no fake IDs.  He has no IDs

24  with other images.

25     I've just submitted to the Court Exhibits 1, 2, and 3 with

1   his Nigerian passport, his U.S. passport, and his naturalized

2   citizenship certificate for New York, for the City of New

3   York.  There's -- I believe it's the Eastern District.

4       He has no criminal history.  It's illegal [sic] to have

5   cash in the U.S.  He's been here for thirteen years.  Like we

6   discussed earlier, the TWC Workforce Commission is not

7   indicative of anything.

8       He had no possession of any personal identifiers of other

9   people.  He didn't have any -- he didn't have a list of other

10  names or anything.

11      We have a -- we have an individual named Somto Chikebede

12  who is a -- who has lived here for four years and has known my

13  client for two years and is willing and able to act as a

14  surety, custodian on his behalf.

15      The Government submits to the Court that he's -- if he is

16  indeed guilty of this, that tomorrow he's going to get out and

17  start offending again, or keep offending, and that's just pure

18  speculation.  In the U.S., an individual has a right to have a

19  firearm.  He is a U.S. citizen.  So if there was a firearm

20  involved, he has a right to possess a firearm.

21      And they've -- I believe, in the interests of justice,

22  that they haven't -- they haven't met their burden that he

23  should be detained.  I don't believe he's a continuing threat,

24  physical or otherwise or economically.

25      They've submitted some evidence of communication from one

1   brother to another.  I submit that's fairly weak evidence, and

2   I'm asking the Court to allow him to be released.

3       Like another lawyer said, due process, it actually does

4   become an issue when these types of cases are filed.

5   Communicating with clients, reviewing evidence.  I know the

6   courts aren't -- I think the courts believe that's addressed,

7   but I submit to the Court, in reality, it's not.  It's

8   extremely difficult to communicate and to do a good job and

9   effective assistance of counsel on these white-collar cases.

10  Going to detention facilities and, you know, flicking through

11  computer screens and showing them documents is just completely

12  unworkable.

13      And I submit to the Court that this -- that my client

14  doesn't really pose a flight risk.  I mean, he doesn't have a

15  passport.  And the theory that he's going to, you know, swim

16  across the Rio Grande, I guess, or go to South Carolina and

17  get on a shrimp boat and go back to Africa, I mean, but I

18  guess that's the way he would go back and do it, I think

19  that's pretty preposterous.  So I'm asking the Court to

20  release him on bond with whatever conditions the Court sees

21  fit.

22      Thank you.

23          MS. CROWDER:  Your Honor, you heard that my client is

24  a legal permanent resid... he's got legal permanent status.

25  He has no criminal history, no prior criminal history

1   whatsoever.  You heard from his life partner, who is the

2   mother of his child, and she verified all the information with

3   regards to family ties.

4       Exhibits 1 through 7 that we introduced into evidence have

5   documentation that he has actually purchased a home in Collin

6   County, has purchased that in February of 2021.  That they had

7   to provide documents in order to get that loan.

8       He has two cars in his name and in Light's name.  He has a

9   child who just turned one.  He has significant ties to the

10  community.  Prior to that, he lived in the Garland home that's

11  in the Pretrial Services report for approximately two years.

12      You did not hear any evidence that my client has been in

13  and out of the country multiple times.  In fact, the detective

14  said that he had no history of him leaving the country.  You

15  heard from Light, his partner, that he did leave the country

16  once in 2017, and that was to bury his father.

17      Second, Your Honor, you did not hear any evidence that my

18  client had -- has any -- had any communications back and forth

19  with any of the codefendants whatsoever.  And I'd like to

20  point out that he is only indicted in Count One and not Count

21  Two, and very minimally stated in the indictment, five out of

22  the 28 manner and means, and that allege a financial crime

23  that occurred that is alleged that he committed a crime in

24  2017.  We are now in 2021.

25      Your Honor, the third most important thing is that we

1    presented an exhibit that documents that my client does -- has

2    been diagnosed with chronic kidney disease, Stage 3.  And I

3    think -- I'm asking the Court to release him for all the

4    reasons stated, but most importantly, so he can take care of

5    his health.

6        I don't believe that the Government has proven that he is

7    an economic danger, or even a flight risk.  And most

8    importantly, he has no criminal history.  They did not seize

9    any firearms.  And so as far as being a danger to the

10   community, I don't believe that the Government has met that

11   burden.

12       So, for all those reasons, we ask that the Court allow him

13   to be released into -- and have Light, who is his partner, be

14   the third-party custodian, and do any conditions that the --

15   that you see -- that you find appropriate in this case.

16       Thank you.

17            THE COURT:  All right.  If you'll give me just a

18   moment to review my notes.

19       (Pause, 12:01 to 12:04 p.m.)

20            THE COURT:  All right.  Ms. Crowder, we're going to

21   start with your client.

22       Mr. Animashaun, if you would please stand, sir.

23       For all the defendants, the Government seeks detention on

24   two grounds:  danger to the community, which requires a

25   showing of clear and convincing evidence, and flight risk,

1   which requires a preponderance of the evidence.  While the

2   testimony that I've heard today is certainly very, very

3   concerning with regard to the economic danger, the standard is

4   clear and convincing evidence.  And given the seizure of much

5   of the information, I don't find that the Government has met

6   its burden on danger to the community, so my focus today is

7   going to be on flight risk.

8        So, with regard to Mr. Animashaun, what I've got here are

9   several factors that I think push it over the line of

10  preponderance of the evidence.  The use of aliases, receipts

11  in alias names, possession of personal identifying information

12  for individuals, access to current bank accounts in a foreign

13  country, lack of a stable residence prior to February 2021.

14  And while he does have a partner and child at that address,

15  he's also got a wife and another child somewhere else.  Lack

16  of stable employment.

17       So when I weigh all of those things, I do find that the

18  Government has met its burden to show by a preponderance of

19  the evidence that there's a flight risk here.  So I am

20  remanding you to the custody of the Marshal pending further

21  proceedings, Mr. Animashaun.  Good luck to you, sir.  You may

22  have a seat.

23       Mr. Moses.  Mr. Moses, I am also finding preponderance of

24  the evidence showing flight risk in your case.  And the reason

25  for that, the use of aliases, the existence of a fake passport

1  from another country, the use of aliases, the possession of

2  personal identifying information.  Residence, current

3  residence of only four months.  But that passport, that's a

4  big factor, that Ghanaian passport.

5      So I'm finding that the Government has met its burden and

6  I'm remanding you to the custody of the Marshal pending

7  further proceedings.  Good luck to you, Mr. Moses.

8      With regard to Mr. F. Orji.

9      (Pause.)

10         MR. WATSON:  Your Honor?

11         THE COURT:  Yes?

12         MR. WATSON:  Just to be clear, did the Court accept

13  my Exhibits 1, 2, and 3?

14         THE COURT:  I did admit them, yes.

15         MR. WATSON:  Okay.  Thank you, Judge.

16         THE COURT:  All right.  And I've weighed those

17  considerably.  I mean, that's -- I understand that the

18  Government was not convinced of his citizenship, but I don't

19  think he'd have a U.S. passport if he wasn't a U.S. citizen.

20  And I've seen the certificate of naturalization that you've

21  submitted.  So I accept for purposes of my analysis that he is

22  a United States citizen.

23      My concern here is that he is a United States citizen, but

24  he's also a citizen of Nigeria.  He's got dual citizenship.

25  Lots of international travel over the last few years.  A wife

1    and his children.  So, considerable family ties to Nigeria.

2    Limited time at his address.  And the currency, foreign

3    currency, and multiple bank accounts.

4         So, for those reasons, I am finding flight -- by a

5    preponderance of the evidence that the Government has shown

6    flight risk.  So, good luck to you, Mr. Orji.  You may have a

7    seat.

8         Mr. C. Orji.

9         (Pause.)

10         THE COURT:  With Mr. C. Orji, this one, this one is

11   close.  This one is troubling.  But I've got an individual

12   here subject to a detainer, so no matter what I do you've

13   still got immigration issues to address, and that's not for me

14   to determine here.  You've got longstanding ties to the

15   community.  Testimony from wife of marriage almost eleven

16   years, residing in the same home with his wife and three kids

17   for ten years, work authorization, but balancing that against

18   24 bank accounts and an ID in a fake name with his picture and

19   debit card.

20        Given the longstanding ties, I am going to find here that

21   the Government has not met its burden with regard to Mr. Orji,

22   but you're not going to be released.  I am going to release

23   you subject to certain conditions that won't be able to be put

24   in place.  I'm going to order an electronic monitor, home

25   incarceration, and this will all be subject to whatever action

 1    is taken by -- he can't be released today.

 2        So here are your conditions of release, sir.  You're not

 3    to violate federal, state, or local law while on release.  You

 4    are to advise the Court or Pretrial Services in writing before

 5    any change in address or telephone number.  You're to report

 6    as required and surrender for service of any sentence imposed

 7    as directed.  Your next court appearance will be your trial.

 8    I'm ordering pretrial supervision.  You are to continue or

 9    actively seek employment, to be verified by Pretrial.  Any,

10    any passport, regardless of where it's from or what name it's

11    in, must be surrendered to the Clerk's Office by noon on

12    Tuesday.

13            MR. CUNNINGHAM:  I have it here.  I'll give it to

14    them today.

15            THE COURT:  Any passports.  He's not to obtain a

16    passport or other type of travel document.  He's to avoid all

17    contact directly or indirectly with anyone who is or may be a

18    codefendant or witness or victim.  He's not to possess any

19    firearms, destructive devices, or other dangerous weapons.

20    And I'm putting him on home detention with an electronic

21    monitor and will restrict him to the residence at all times

22    except for work, school, church, going to the doctor, going to

23    court.

24        And again, that's going to be subject to the determination

25    of whether he's going to get a bond from the Immigration

1   Service.

2        Do you understand these conditions, sir?

3            DEFENDANT C. ORJI:  Yes, Your Honor.

4            THE COURT:  The law requires that I tell you what

5   could happen if you don't follow these conditions.  Failing to

6   appear in court as required is a separate crime for which you

7   may be sentenced to imprisonment.  If you violate any

8   condition of release, a warrant can be issued for your arrest,

9   you can jailed until trial, and also separately prosecuted for

10  contempt of court.

11       If you commit another crime while on pretrial release,

12  that could lead to more severe punishment than you would

13  otherwise receive for that same crime at any other time.  And

14  it is a crime to try to influence, threaten, attempt to bribe,

15  or retaliate against any juror, witness, or other person who

16  may have information about the case, or to otherwise instruct

17  the administration of justice.

18       Do you understand what could happen if you don't follow

19  the conditions?

20           DEFENDANT C. ORJI:  Yes, Your Honor.

21           THE COURT:  One other condition I meant to impose and

22  forgot:  You are not to open any new bank accounts.

23           DEFENDANT C. ORJI:  Yes, Your Honor.

24           THE COURT:  Or create and open any new businesses.

25       Are there any other conditions the Government asks the

 1   Court to consider?

 2          MS. WALTERS:  Your Honor, we would ask no contact

 3   with codefendants in this case or the counterpart cases, just

 4   as the exact same condition that was imposed on Ms. Occoro

 5   (phonetic) on Wednesday.

 6          THE COURT:  I'm also going to impose that

 7   clarification that no contact with codefendants in the related

 8   cases, and I'll issue an order that lists those.

 9       All right.  Do you understand these conditions?

10          DEFENDANT C. ORJI:  Yes, ma'am.

11          THE COURT:  I have signed the order.  I am going to

12   hand it down.  Take your time to go over that order, ask your

13   attorneys any questions.  I will be happy to answer any

14   questions.  By signing that order, you will be telling the

15   Court that you fully understand your conditions of release,

16   you agree to follow those conditions, and you understand what

17   could happen if you don't.

18       We're both going to be comfortable -- hold on, hold on.

19   We're both going to be comfortable before you leave here today

20   that you do fully understand those conditions.  Later on, if

21   any violation is shown, I'll know that it's not as a result of

22   a lack of understanding.  I'll take that as an indication that

23   you choose not to follow my conditions, and I can revoke you

24   on that basis.

25       It's important you understand I am considered a zero-

1    tolerance policy judge.  That is a federal court order that

2    governs your release while you are awaiting trial on federal

3    criminal charges.  So any violation, no matter how technical,

4    is still a violation of a federal court order.  You're either

5    going to follow it or you're not, and if you're not it will be

6    extremely difficult for you to convince me that your

7    conditions should not be revoked.  So I expect those

8    conditions to be followed to the letter of the law.  Do you

9    understand that, sir?

10            DEFENDANT C. ORJI:  Yes, Your Honor.

11            THE COURT:  All right.  You may have a seat.

12       (Pause.)

13            THE COURT:  If you'll hold onto it for just a second,

14   I'd like for you to show that last page to Mr. Orji.

15            MR. CUNNINGHAM:  Yes, Your Honor.

16            THE COURT:  Sir, is that your signature on that page?

17            MR. CUNNINGHAM:  I'm sorry, Judge.  Uh, --

18            THE COURT:  The signature page of the order.

19            MR. CUNNINGHAM:  Yes.  Okay.  I had it in the wrong

20   order.  But yes, we've got it now.

21            THE COURT:  Is that your signature, sir?

22            DEFENDANT C. ORJI:  Yes, Your Honor.

23            THE COURT:  Did you have a chance to review that

24   order before you signed it?

25            DEFENDANT C. ORJI:  Yes, Your Honor.

1          THE COURT:  Did you have a chance to ask your

2    attorneys any questions you had?

3          DEFENDANT C. ORJI:  Yes, Your Honor.

4          THE COURT:  Do you have any questions for me?

5          DEFENDANT C. ORJI:  Not at this time.

6          THE COURT:  By signing that order, are you telling

7    the Court that you fully understand your conditions of

8    release, you agree to follow those conditions, and you

9    understand what could happen if you don't?

10          DEFENDANT C. ORJI:  Yes, Your Honor.

11          THE COURT:  Then I hereby order you released after

12    the conditions have been put in place.  And again, you've got

13    a detainer.  You're going through the immigration process

14    first.  But to the extent you get released, then Pretrial

15    Services will have to notify me that you've been -- that it's

16    got the equipment available and ready.  We don't know when

17    that's going to be.  So you're not ordered released from our

18    custody.  Can we put a detainer?  Where's the Marshal?  We can

19    put a detainer on him when he's done with Immigration to take

20    care of the other things.

21        Do you have any questions about anything we've covered

22    here today?

23          DEFENDANT C. ORJI:  No, Your Honor.

24          THE COURT:  All right.  Anything else the Court

25    should address with regard to Mr. C. Orji?

1          MR. CUNNINGHAM:  Nothing, Your Honor.

2          THE COURT:  Is the Government asking for a stay of my

3    order pending any appeal?

4          MS. WALTERS:  No, Your Honor.

5          THE COURT:  All right.  Good luck to you, sir.  We

6    are adjourned.

7          THE CLERK:  All rise.

8       (Proceedings concluded at 12:25 p.m.)

9                              --oOo--

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        **10/23/2021**

23   _____     _____
     Kathy Rehling, CETD-444                       Date
24   Certified Electronic Court Transcriber

25

INDEX

1

2        PROCEEDINGS                                                        3

3        WITNESSES

4        Government's Witnesses          Direct Cross Redirect Recross

5          Jason Hollingshead            11   38/43   59       62
                                              49/55

6

7        Defendant C. Orji's Witnesses   Direct Cross Redirect Recross

8          Gary Davis                    66   74
           Alicia Orji                   75   78

9        Defendant Animashaun's Witnesses Direct Cross Redirect Recross

10         Imoleayo Osasona              82
           Somtoochukwu Chikebebe        92

11       EXHIBITS

12

13       Defendant F. Orji's Exhibits 1 through 3       Received 81
         Defendant Animashaun's Exhibits 1 through 8    Received 90

14       RULINGS

15       Defendant E. Orji - Waiver of Detention Hearing           9
         Defendant E. Orji - Entry of Not Guilty Plea              9

16       Defendants Animashaun, Moses, C. Orji, and F. Orji      107

17       END OF PROCEEDINGS                                        116

18       INDEX                                                     117

19

20

21

22

23

24

25